## DIPSON THEATRES, Inc. v. BUFFALO THEATRES, Inc. et al.

No. 247, Docket 21887.

United States Court of Appeals Second Circuit.

Argued May 9, 1951.

Decided July 25, 1951.

Borins & Hoffman, Buffalo, N. Y. (Robert L. Wright, Washington, D. C., Louis Borins and Dwight Campbell, Jr., Buffalo, N. Y., counsel), for appellant.

Raichle, Tucker & Moore, Buffalo, N. Y. (Frank G. Raichle, Buffalo, N. Y., C. Stanley Thompson, Louis Phillips, New York City, and James O. Moore, Jr., Buffalo, N. Y., counsel), for appellees Buffalo Theatres, Inc., Loew's Inc. and Paramount Pictures, Inc.

Sidney B. Pfeifer, Buffalo, N. Y. (John F. Caskey and Harry M. Pimstein, New York City, counsel), for defendants-appellees RKO Radio Pictures, Inc., and Twentieth Century-Fox Film Corp.

O'Brien, Driscoll, Raftery & Lawler, New York City (Edward C. Raftery and George A. Raftery, New York City, counsel), for appellee, United Artists Corp.

O'Brien, Driscoll, Raftery & Lawler, New York City (Edward C. Raftery, George A. Raftery, Robert W. Perkins and Morris Ruffman, all of New York City, counsel), for appellee Warner Bros. Pictures Distributing Corp., formerly called Vitagraph, Inc.

Brown, Kelly, Turner & Symons, Buffalo, N. Y. (J. Edmund Kelly and John E. Leach, Buffalo, N. Y., counsel), for appellee Vincent R. McFaul.

Dwight, Koegel, Harris & Caskey, New York City, for defendant-respondent Twentieth Century-Fox Film Corp.

Alfred M. Zisser, Buffalo, N. Y., and Schwartz & Frohlich, New York City, for defendant-respondent Columbia Pictures Corp.

Before SWAN, AUGUSTUS N. HAND and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This action was originally instituted in 1946 by Dipson Theatres, Inc. (hereinafter called Dipson), against eight national film distributors,[1] hereinafter called Warner, Loew, Paramount, RKO, Fox, Universal, Columbia, and United; Buffalo Theatres, Inc. (hereinafter called Shea), its subsequently dissolved subsidiary Bison Theatres Corporation, and its president, McFaul, for treble damages arising from a violation of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 ff. The violation was an alleged conspiracy among all the distributor defendants, Shea and McFaul, to give Shea a monopoly of first and second run exhibition of the distributor defendants' films in Buffalo, New York, and its environs, to the injury of three of Dipson's theatres, the Bailey, the Century and the Ridge, by concertedly refusing to license the above theatres to show motion pictures for the run[2] desired

---

1. Vitagraph, Inc.,* Loew's, Inc., Paramount Pictures, Inc., RKO Radio Pictures, Inc., Twentieth Century-Fox Film Corporation, Universal Film Exchanges, Inc., Columbia Pictures Corporation, and United Artists Corporation.

* Warner Bros. Pictures Distributing Corp.

2. The terms "clearance" and "run" are fully discussed in the Paramount case, Paramount Pictures v. U. S., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. Briefly

by Dipson and to which Dipson asserts the theatres were entitled by reason of their location and appointments. The case was heard by Knight, J., who dismissed the entire action at the close of the plaintiff's case against Columbia and against all defendants in so far as it involved the Ridge Theatre. No appeal is taken from this dismissal. This appeal is from the subsequent decision of Knight, J., holding (except in so far as he dismissed the cause of action against Universal) that the plaintiff had failed to prove any conspiracy among the other defendants with respect to the Bailey and Century theatres and in addition that the plaintiff had failed to show any damage to those theatres resulting from defendants' conduct. On appeal Dipson claims as damages operating losses at the Century in the 1940–41 season, and lost profits at the Bailey for the years 1939–1946 inclusive.

The facts are as follows: One Michael Shea was one of the first—if not the first —motion picture theatre operators in Buffalo (1914). He and his successors had always had an excellent reputation for good entertainment and for meeting their obligations to the distributors. As the demand for theatres increased, he, in 1925, sold a part interest in his theatre chain to Paramount's predecessor to obtain financing to build the Buffalo theatre, still the largest in the area. In 1926, Michael Shea acquired by lease the Kensington theatre, and in 1928 the Bailey, both in northeast Buffalo. In 1928 Loew—who operated the Century—turned it over to Michael Shea in return for a part interest in the business. Michael Shea died in 1934 and McFaul, his successor, Paramount and Loew then organized the corporate defendant Shea to continue the business. In 1939 Nikitas Dipson, who

controlled or was associated with a large theatre chain, commenced operations in the Buffalo area. Among the theatres that he acquired were three formerly operated by Shea: the Century, a downtown first run theatre, the Bailey, a neighborhood theatre, and the Rivieria, a suburban theatre. Shea declined an opportunity to renew his leases and to continue operation of these properties. Dipson also acquired the Ridge, another suburban theatre which had been offered to Shea and refused.

By 1940, after Dipson had entered the area, there were 67 motion picture theatres in Buffalo with an aggregate capacity of 66,684 seats, of which 5 were first run. Shea operated 11 of these, including 3 of the first run theatres with a capacity of 9,979 seats, the remaining 8 being neighborhood theatres with a capacity of 9,040 seats. Three of these Shea neighborhood theatres, the Seneca, Kensington and Elmwood, were operated as second run theatres, that is, Shea showed pictures licensed to it at them before showing the same picture at its 5 other theatres and before the licensors released them to other theatres. Pictures not licensed to Shea for second run appeared in other theatres prior to 1939, and after that time also at the Bailey. The Dipson combine operated 10 neighborhood theatres with a capacity of 11,230 seats, and the first-run Century. There was one independent regular first run theatre, the Lafayette. Of the distributor defendants, only Paramount and Loew had any financial interest in the theatres here involved or in any theatres in the Buffalo area. Prior to Dipson's entry into Buffalo the 6 percent distributor defendants[3] got ca. 59% of their Buffalo revenue from Shea theatres.

There being admittedly no direct evi-

the theatre which is licensed by a distributor to first show a given picture in a given area has the first (and ordinarily most profitable) run, the next theatre licensed to show the picture has the second run, and so on. Clearance is the time in days between the end of one run and the start of the next lower numbered run. It is the general practice in the motion

picture industry to set forth the clearance and run in the agreement by which the distributor licenses the exhibitor to show a picture and the clearance and run provided are major factors in determining the film rental to be paid.

3. If Columbia is included the figure drops to 56%; the figures for Universal do not appear.

dence of the alleged conspiracy, plaintiff attempted to prove its existence by circumstantial evidence built around his experiences with the Bailey and Century theatres after he or his predecessors acquired them from Shea. The two theatres will be considered separately.

### Bailey.

In 1926 Michael Shea obtained a lease on the Kensington theatre in northeast Buffalo. Two years later he similarly acquired the Bailey in the same general area but some 1.7 miles away. The Bailey was sold to the plaintiff in 1939. Plaintiff asserted that prior to 1939 it had been a second run theatre [4] but that after plaintiff acquired it, it was demoted to a third run theatre pursuant to a conspiracy among the defendants. He also asserted that the Bailey was a better theatre in every way than the Kensington so that had no conspiracy existed, the distributor defendants would have preferred to exhibit at the Bailey where their film rentals would have been higher. Had plaintiff been able to prove that all the distributor defendants had demoted the Bailey after its sale to plaintiff and that it was a superior theatre to the Kensington, there would have been a justifiable inference that a conspiracy existed as alleged. However, plaintiff was unable to do so. The Bailey had never been a wholly second run theatre but had been given some second and some third runs by Shea of the films licensed to the latter by the various distributor defendants. The Kensington was originally the only second-run theatre in the neighborhood and all the distributor defendants licensed it as such up to 1939. When the Bailey came under the same management, Shea had, with the oral consent of the distributor defendants, originally shown approximately half the pictures he exhibited second run in the neighborhood at the Bailey, and half at the Kensington. From 1936 on he had gradually shown more and more pictures second run at the Kensington

so that by 1938, a majority of the product of Warner, United and RKO was showing second run at the Kensington as was a constantly increasing percentage of the product of Fox. It is not disputed that the Kensington and the Bailey were so similar in quality and location that they could not economically play "day and date," i. e., each show the same feature on the same day. In other words, one had to be preferred over the other. So long as they were under common management, no difficulty arose from this fact, for most of the distributors were evidently content to let Shea determine what order of presentation would result in the greatest gross for them and for him. When they became separately managed, the distributors were forced to decide which they would license first and what clearance they would give. Dipson wanted the entire second run with a 7 to 21 day clearance over the Kensington. Shea argued that the distributors should again implement the clause in the licenses calling for a 21 day clearance in favor of the Kensington but was unable to get this treatment from any distributor. Instead of uniformly choosing the Kensington the distributors acted as follows:

1. Loew licensed the second run to the Kensington with one week clearance over the Bailey.

2. Paramount did the same.

3. Fox, which had a three year franchise agreement with Shea, licensed second run to the Kensington with no clearance over the Bailey.

4. Warner licensed half its pictures to each for second run.

5. Universal offered to license all its pictures for second run to the Bailey. This offer was not accepted by Dipson though it is not shown why it adopted that course.

6. Columbia licensed all its pictures for second run to the Bailey.

7. RKO licensed its pictures for second run to the Kensington with one week clearance over the Bailey.

---

4. In Buffalo there was a 30 day clearance between the first and second run.

8. United Artists licensed its pictures individually but generally licensed its pictures for second run to the Kensington first, with one day clearance over the Bailey.

We insert here a table indicating in summary form the actions of the distributor defendants with respect to the Bailey-Kensington and other similar situations in the area:

| Distributor | BUFFALO | | Downtown | | LACKAWANNA | | TONAWANDA |
|---|---|---|---|---|---|---|---|
| | Bailey (Dipson) | Kensington (Shea) | Century (Dipson) | 3 Shea Theatres | Ridge (Dipson) | Lacka-wanna (Shea) | Riviera 4 (Dipson) |
| Paramount | 3d run | 2d run 7 days clearance | | 1st run | 2d run | 1st run | 1st run |
| Loew | 3d run | 2d run 7 days clearance | | 1st run | 2d run | 1st run | 1st run |
| RKO | 3d run | 2d run 7 days clearance | 1st run | | 1st run | 2d run | 1st run |
| Fox | 3d run | 2d run no clearance | | 1st run | 1st run | 2d run | 1st run |
| United | generally 3d run | 2d run 1 day clearance | irregularly split among 8 theatres [1] | | 1st run | 2d run | 1st run |
| Warner | ½ 2d run | ½ 2d run | ½ 1st run | ½ 1st run | ½ 1st run | ½ 1st run | [2] |
| Columbia | 2d run | 3d run | neither [3] | | [2] | | [2] |
| Universal | Offered 2d run | | neither [3] | | 2d run | 1st run [5] | [2] |

[1] ca. 8½% to the Century, 70% to the 3 Shea theatres.
[2] Not shown.
[3] Lafayette had 1st run.
[4] No Shea Theatre.
[5] 1st run offered Dipson who refused.

In summary, Paramount and Loew licensed Shea first throughout but licensed Dipson where there was no immediately competing Shea theatre; RKO preferred Shea at the Kensington, Dipson elsewhere; Fox licensed Shea first at the Kensington and downtown, Dipson elsewhere; United had no fixed policy but apparently preferred Shea at the Kensington,[5] to some extent downtown and Dipson elsewhere; Warner played no favorites, and Columbia and Universal favored Dipson or the Lafayette, a downtown theatre owned by an independent.

Far from being circumstantial evidence of a conspiracy, the conduct of the distributors tabulated above would appear to be evidence to the contrary. With the exception of Loew and Paramount,[6] who continued to exhibit their own product in theatres in which they had an interest the distributors appear to have taken in-

5. United showed only about one picture a month at the Kensington and Bailey so that its actions were of minimal importance as far as Dipson's supply of film was concerned.

6. Loew and Paramount in 1934 each signed a 10 year first run franchise agreement with Shea. This was not renewed when it expired in 1944.

dependent action impelled, if anything, by a desire to favor Dipson who was a far larger exhibitor than Shea in the country as a whole.

However, the inference of conspiracy might have been sustained if Dipson could have shown that the Bailey was, from the distributor's point of view, clearly a better customer, i. e., capable of producing more revenue, than the Kensington. This he failed to do. There was considerable conflict in the evidence as to which was the better appointed theatre. But, it was uncontroverted that the Kensington was in a growing, the Bailey in a declining, neighborhood. There was also dispute as to which theatre would ordinarily out-gross the other. There, however, is uncontroverted evidence that on the only occasion when the same show ("Pinocchio") played both theatres on the same day, the Kensington out-grossed the Bailey. Warner, which split its product between the Bailey and the Kensington in the years 1939–1943 inclusive received almost twice as much rental from the Kensington as from the Bailey. There was also evidence showing that on the, average the Bailey grossed more playing after the Kensington than it did playing comparable pictures second run. This is concededly unusual and was ascribed, apparently with good reason, to Shea's prior advertising which had benefited Dipson in view of the latter's policy not to advertise the Bailey pictures. There was also convincing evidence that the Bailey's gross was being very adversely affected by the activities of the management of the Genesee theatre. The Genesee was much closer to the Bailey than the Kensington, was of comparable quality, and charged lower admissions. One Basil, who managed and had a half interest in the Bailey, owned the Genesee and in order to favor his wholly owned theatre had violated the agreed clearance and run between it and the Bailey, there being 93 instances of this practice in the year 1940 alone.

In the light of the foregoing a conspiracy was not established because some of the distributors, when forced to choose between the Bailey and the Kensington, decided that they would gross more at once and in the long run by showing all their pictures at the Kensington first, thus continuing the established trend toward that theatre. In addition, various of the distributor defendants had additional reasons for their choice. Thus Loew, in addition to having an interest in the Kensington, had had unfortunate financial dealings with Dipson in the past. RKO and Fox had had similar experiences, and Warner's experience with Dipson at the Century was not satisfactory. The fact that Dipson, although an experienced exhibitor, was also far more of a dealer in theatres than Shea, was a further factor in the decisions of some distributors to prefer the Kensington.

### The Century.

The century was one of five first run theatres in Buffalo. One of the remaining four [7] was independent, the balance were operated by Shea. (Great Lakes, Buffalo and Hippodrome). The Buffalo and the Great Lakes were the best located and appointed and it had been Shea's policy even when it controlled the Century to play the top pictures at them rather than at the Century. Warner and possibly other distributor defendants also insisted on this. In addition to not being in the center of the downtown theatre district, the Century was in poor physical condition, and Dipson's successor spent over $50,000 restoring it before it became profitable. Even under Shea management the Century lost money and Shea did not renew its lease when it expired in 1939. Under Dipson management the Century showed first run the pictures of RKO and one-half of Warner; the Lafayette (an independent) showed Columbia and Universal; Shea showed Loew, Paramount, Fox and one-half of Warner, and United showed at all five theatres as well as at certain others, approximately 9% of its

7. Certain other independent theatres occasionally played first runs.

product appearing at the Century. Thus Dipson with 20% of the theatres showed the pictures of about 20% of the distributors, and Shea with 60% of the theatres showed the product of somewhat less than 60% of the distributors. It also appears that Dipson actually showed a better grade of pictures at the Century than Shea had. Dipson also lost money on the Century but after it passed into other hands which exhibited the same product as Dipson had it became a profitable property. Dipson surrendered the Century lease in 1941. At that time it blamed its lack of success not on the actions of the defendants but on a nation-wide decline in motion picture attendance.

From the above it can be seen that there is no evidence that the distributor defendants combined to deny Dipson access to first run films at the Century. It got some of the product of Warner and United, and all of RKO. Columbia and Universal had never licensed the Century before or after its acquisition by Dipson. Any substantially different pattern of distribution in Dipson's favor would have been an unfair discrimination against Shea or the independent first run exhibitor.

Shea entered into no tie in arrangements, i. e., agreeing to show film first run only if favored in the second, or vice versa, nor did it ever preempt the supply of films by contracting for more films than it could exhibit.

After the above facts had been brought out at the trial, Knight, J., who had had extensive experience in motion picture antitrust cases, decided that no conspiracy had been shown and that the distributor defendants had merely exercised their independent and individual right to select their own customers.[8] He also held that Dipson had shown no damage re-sulting from the actions of the defendants. His opinion was subsequently supported by detailed findings. Dipson now asserts that it has met the heavy burden of showing that these findings and conclusions are clearly wrong.[9] On this appeal Dipson seems to have assumed that the decision in United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, settled the question that a conspiracy existed among the defendants in this case and that citation of that authority alone justifies a reversal. Hence the majority of it argument is directed at the holding that it had suffered no damage as a result of defendants' conduct. That is not the case. True, the eight distributors who were originally defendants here were defendants there and were there found to have violated the Sherman Act by conspiring to and restraining trade in the exhibition of motion pictures by fixing admission prices, setting unreasonable clearances and runs, and requiring block booking. Joint ownership of theatres was found to facilitate this conspiracy and was, with certain exceptions, enjoined. However, we have already had occasion to pass on the question of whether the Paramount case, supra, is conclusive of the question of conspiracy among the distributor defendants in a private treble damage action involving a single city. We answered in the negative, and in Fifth & Walnut v. Loew's Incorporated, 2 Cir., 176 F.2d 587, we said, at page 590:

"It is of the essence of plaintiffs' argument that 'but for the fact that a Jury had to pass upon the question of damages,' a directed verdict would have been required. This contention, which we must reject, is the basis for their objections to the charge and the refusals to charge. Obviously what the plaintiffs are doing is to confuse evidence of conspiracy, to

---

8. "It is doubtless true that each of the distributors, acting separately, could have refused to furnish films to the exhibitor without becoming amenable to the provisions of the act, but here it is alleged that they combined and conspired together to prevent him from leasing from any of them. The illegality consists, not in the separate action of each, but in the conspiracy and combination of all to prevent any of them from dealing with the exhibitor." Binderup v. Pathe Exchange, 263 U.S. 291, 312, 44 S.Ct. 96, 100, 68 L.Ed. 308.

9. For the extent of this burden see United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150.

be evaluated by the jury, with demonstrated proof, to be accepted as final by the court. It was not the move-over arrangement itself that was condemned in United States v. Paramount Pictures, Inc., 334 U.S. 131, 159, 160, 68 S.Ct. 915, 92 L.Ed. 1260, * * * but rather the discriminatory fashion in which move-over privileges were accorded by distributors * * *.

"Likewise, the joint operation of the Brown Theatre by one independent exhibitor and a subsidiary of one of the defendants (Loew's) was a type of activity which would not be unlawful unless a conspiracy to monopolize or restrain commerce by means of that activity was found by the jury to exist as to some of the defendants in the present action. The condemnation of joint interests in the decision in United States v. Paramount Pictures, Inc., D.C.S.D.N.Y., 70 F.Supp. 53, is not to be regarded as a declaration that joint ownership as such is illegal. It was made in a suit between the United States and various distributors and exhibitors on the basis of the particular facts of that case, and the presence of some of the defendants in the two actions did not relieve the plaintiffs in the present action from the necessity of satisfying the jury that a conspiracy existed. Of course, no one could reasonably contend that every joint ownership of a theatre, irrespective of all surrounding circumstances, is a violation of the Sherman Antitrust Act; and no such decision has ever been made. * * *"

■ Also the expediting court in the Paramount case specifically held, contrary to Dipson's position, that "The decision of such controversies as may arise over clearances should be left to local suits in the area concerned". U. S. v. Paramount Pictures, D.C., 66 F.Supp. 323,-342. The fact that plaintiff now concedes that Columbia and Universal were not parties to the present conspiracy and concededly Shea and McFaul were not par-

ties to the original Paramount action also indicates that that case is not controlling here. There is also no showing that evidence of the Buffalo situation was introduced or relied upon by the government in proving the conspiracy in the Paramount case. Therefore we must look to the record in this case to see if Dipson has shown that the general conspiracy found to exist in the Paramount case, or some other conspiracy, had as one of its objects or effects the monopolization of the first and second run exhibition of pictures in the Buffalo area and that he suffered injury as a result. Of course, the activities revealed in the Paramount case lead us to scrutinize with great care the activities of the same defendants here for where one has violated the Sherman Act in one situation, it might be expected that the same parties would be willing and able to do so elsewhere.

It will simplify matters if the defendants are split into four groups: one, the distributors RKO, United and Warner, who neither owned theatres in Buffalo nor had franchise agreements with Shea; two, Fox, who had a first and second run franchise agreement with Shea; three, Loew and Paramount who not only between them controlled Shea but up to 1944 had a first run franchise agreement with Shea; four, Shea and McFaul, the exhibitor defendants.

In considering evidence of a conspiracy it should be kept in mind that there are a limited number of pictures available for exhibition so that what one exhibitor gets for a given run is necessarily not available to his competitor.[10] A distributor is, therefore, by the very act of distributing pictures, favoring some exhibitors at the expense of others. At best an inference of conspiracy would only arise if it appeared more to the interest of the distributors involved to adopt a different pattern of distribution than the one actually employed. Thus there is nothing illegal in the mere fact that Dip-

---

10. The process is well summarized in Westway Theatre v. Twentieth Century Fox Film Corp., D.C., 30 F.Supp. 830, 834, affirmed on opinion below, 4 Cir., 113 F.2d 932.

son could not get all the pictures it wanted for the runs it wanted. If it had done so it would have been subject to the same sort of legal action it is now maintaining against the defendants.

We agree with the trial judge that the first group of defendants—RKO, United and Warner—have not been shown to have been parties to a conspiracy. The mere tabulation of their diverse actions with respect to Shea and Dipson is alone enough to support the decision below since all direct evidence of a conspiracy is lacking. Dipson's allegations in its brief that the actions of these defendants were only taken after clearance with and on sufferance of Shea are entirely unsupported by the record and even had such conspiracy existed no reason for such sufferance is suggested.

Fox as we have indicated, favored Dipson except where it was bound by its first and second run franchise [11] with Shea. Such franchises are not illegal *per se* and the fact that Fox and Shea entered such an agreement in 1937 is not significant. At that time Shea controlled a larger percentage of first and second run theatres than it did after Dipson entered the area and such an agreement was quite logical for both parties. By it, and its franchises with Loew and Paramount, Shea assured itself of a basic supply of pictures and Fox was assured that its product would be exhibited by the best first and second run exhibitor in Buffalo. Dipson was not even on the scene when the franchise agreement was signed. Fox did not blindly follow the lead of Loew and Paramount for it gave Dipson all it could under its agreement with Shea, that is, a run at the Bailey immediately after the Kensington, whereas the others insisted on seven days clearance. Dipson asserts that the conspiracy existed in 1939 and Fox was a party. We are convinced to the contrary. Nor do we think that the renewal of the franchise in 1940 was shown to have been improper. Early in 1940 Nikitas Dipson, the president of Dipson, wrote one Samson, Fox's Buffalo representative, ask-

ing that Dipson be considered as a Fox first run outlet when Fox's franchise with Shea expired. Samson forwarded this letter to Fox's head office in New York and so informed Dipson. After Nikitas Dipson let the matter drop for three months, he wrote Kent, Fox's president, direct, who, after investigating the matter, replied that a renewal of the franchise had been negotiated some weeks before and that in any event the Shea account had been so satisfactory that Fox would have exhibited in his first run theatres rather than in the Century. We have already shown that the Century was a far less desirable outlet than the Shea theatres. There is no correspondence in the record to show that Dipson ever asked for Fox's second run product. As we have already indicated, the choice of Fox under such circumstances to license its product to Shea for another three years rather than for just one year did not show that it and the two remaining groups of defendants were conspiring to harm Dipson.

After eliminating Fox, RKO, United and Warner, from the alleged conspiracy it remains to determine if there was sufficient evidence to support the decision of Knight, J., that no conspiracy existed between Loew and Paramount on the one hand and Shea and McFaul on the other that the former would exhibit their pictures first and second run solely with the latter. As sufficient to overcome Knight J.'s decision, Dipson points out that Paramount and Loew each had a double connection with Shea in that each had a large financial interest in it, Paramount since 1925, Loew since 1928; that since Shea's corporate organization in 1934 both had had ten year first run franchise agreements with it (the franchises expired in 1944 and were not renewed); that although they had no second run frachise with Shea, each of them licensed Shea for second run at the Kensington, rather than Dipson at the Bailey.

As was the case with Fox, the franchises could not have been aimed at Dipson as the latter was not in Buffalo when they

---

11. A franchise is a license extending for more than one exhibition season.

were made, but this does not mean that a conspiracy could not have originated then to which Dipson later fell victim, or that a conspiracy could not have arisen after Dipson entered Buffalo, although the latter is not even alleged. Shea's failure to retain control of the Century and Bailey in 1939 is support for the finding that no conspiracy existed before that time and franchises executed in 1934 are not evidence of a conspiracy arising in 1939. Officers of both Loew and Paramount testified that it was the policy of each to favor theatres in which they had an interest, all other things being equal. This was to be expected,[12] and the fact that they did so is no evidence that they conspired to do so jointly rather than doing so individually. As we have already indicated, joint ownership of theatres by distributors is not illegal *per se* though the practice had given rise to sufficient abuse so that it was condemned in the Paramount case and both Paramount and Loew have since consented to surrender their interest in Shea.

Had a monopoly been obtained by Shea we might have viewed the question differently but Shea did not have a monopoly of first and second run theatres in Buffalo and Loew and Paramount did not have a monopoly of available films. Shea did not use first run buying power to get second run preference, or vice versa, nor indeed has any such abuse been claimed. Nor did it attempt to exclude Dipson by contracting for more films than it could use. Dipson could and did obtain sufficient films to exhibit at the Century and Bailey (although it did not obtain all it desired). Had a monopoly been the aim of Loew and Paramount, they would have caused Shea to retain control of the Century and Bailey. We hold that their activities did not show a joint action that should upset the finding that no conspiracy existed between them.[13]

There is also an inherent lack of plausibility in the complaint as a whole. If the defendants were engaged in a conspiracy to monopolize first and second run exhibitions in Buffalo, why would Shea fail to retain control of the Bailey and the Century in 1939, when it appears that it was offered a chance to buy the Bailey and renew the lease on the Century? If the theatres were as profitable as Dipson would have us believe, Shea would naturally have kept them. Furthermore, the complaint was dismissed as to the defendants Universal and Columbia and in so far as it applied to the Ridge Theatre, and no appeal has been taken from the dismissal. A conspiracy among the six remaining distributor defendants aimed at only two of the plaintiff's many theatres while all but Paramount and Loew favored the plaintiff elsewhere (and even they licensed it in Tonawanda) would seem to have been futile. Such a conspiracy would be entirely different from that shown in the Paramount case which apparently favored large combines such as Dipson. Also RKO, United and Warner did not regularly favor Shea even in the two theatres remaining at issue.

Dipson makes much of the fact that it was unable to get the runs it wanted on any terms, but there is no evidence that it offered the distributor defendants better terms than they were getting from Shea, in fact Dipson willingly agreed in 1943 to take all Warner's product third run at the Bailey in return for a reduction in film rental. As we have said, had Dipson's demands been acceded to by the distributors it would have secured a monopoly with far less reason to support it than Shea has ever had. There is evidence that Dipson wanted all or nothing from each distributor and testimony from its own witness that its aim was a monopoly.

In summary, the plaintiff only alleges

12. The consent decree entered into by Paramount in 1940 specifically preserved its right to favor its own theatres.

13. Compare the facts in this case with those shown where a conspiracy was found to exist. E.g., Ball v. Paramount Pictures, 3 Cir., 169 F.2d 317; William Goldman Theatres v. Loew's, Inc., 3 Cir., 150 F.2d 738, certiorari denied 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742.

a conspiracy with respect to runs and the conduct of the distributor defendants fails to indicate that any such conspiracy existed. Except for Loew and Paramount, all the distributor defendants gave plaintiff the run it desired in some of its theatres where it competed with Shea. Loew and Paramount could legally favor their own theatres and plaintiff was able to obtain sufficient pictures for its theatres.

In view of the foregoing we find that Judge Knight's conclusion as to the lack of any conspiracy affecting the Bailey and Century was supported by the evidence and must be sustained. As we affirm the decision below on the ground that no illegal conspiracy is shown, it is unnecessary to discuss so much of that opinion as held that conspiracy or not, plaintiff had suffered no damages. Suffice it to say that it appears from the record that there were many reasons given by the appellees which would explain Dipson's lack of financial success even in the absence of conspiracy and would negative any inference of conspiracy that might arise from the existence of unexplained damages or losses. The losses at the Century seem to have been the result of bad management, and at the Bailey seem in a large part due to bad management, unfair competition by the Genesee and a general decline in the neighborhood.

Affirmed.