**WEBSTER ROSEWOOD CORPORATION, Plaintiff,**

v.

**SCHINE CHAIN THEATRES, Inc., et al., Defendants.**

**Civ. A. No. 3679.**

United States District Court
N. D. New York.

Dec. 10, 1957.

252

Gray, Anderson & Schaeffer, Philadelphia, Pa., for plaintiff, Francis T. Anderson, Cormac J. Malloy, Philadelphia, Pa., of counsel.

Raichle, Tucker & Moore, Buffalo, New York and Antevil & Antevil, Gloversville, New York, for defendants, James O. Moore, Jr., David C. Diefendorf, Buffalo, N. Y., Howard M. Antevil, Gloversville, N. Y., of counsel.

FOLEY, District Judge.

This action is one under the anti-trust laws involving the usual provisions of the Sherman and Clayton Acts (15 U.S.C.A. §§ 1, 2, 15, 16). It involves the motion picture business and by the complaint brings back on the screen the Schine interests, named as defendants, and the eight major distributors named as co-conspirators. Apparently, this type action will rise eternal against these same defense and conspirator players who featured in the court struggles of the 1940's in relation to conspiracy and monopoly government charges in the distribution and exhibition of motion pictures. Of course, the Schine decision is the important one in this controversy. Schine Chain Theatres, Inc., v. United States, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; D.C.W.D.N.Y.1945, 63 F.Supp. 229; U. S. v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed 1260; D.C., 85 F.Supp. 881. The voluminous complaint generally is patterned after the writings in these decisions, but there is not too great resemblance between the complaint and the evidence produced at the trial in behalf of the plaintiff. Although this variance is not at all fatal under our liberal procedures, these catch-all allegations taken from law

books without too much regard for the actual circumstances and filed in 1950 in this district court, did not stand too well against actual trial combat in 1957, and the wide range of issues indicated by the complaint narrowed very much. In fairness it should be noted that the draftsmen of the complaint were not the same lawyers who undertook the preparation for trial and tried the case before me for the plaintiff. Complexity is inherent in these cases because of the broad sweep of the antitrust statutes in their terms and established interpretations. The conspiracy element is usually a nebulous thing to tie down because the evidence always tends to range far and wide; at times, in my judgment, with an inclination to outer space unless restricted. However, this situation should be simple in contrast because the plaintiff, except for the impact it urges of the findings and decrees in the Schine decisions on the questions of conspiracy and monopoly, limits the dispute we have to the deprivation of a first neighborhood run by reason of such conspiracy and monopoly and wants the comparative theatres limited to two alone, the Webster of the plaintiff and the State of the defendants, both located in the northeastern part of the City of Rochester, New York, three quarters of a mile or six blocks apart. Despite this simplicity of approach taken by the plaintiff, the evidence in its behalf followed again the roving design, and we were taken back to 1927 in an attempt to establish a perpetuity of business villainy on the part of Schine into the damage period claimed here from 1942 to 1950. The chief witness for the plaintiff corporation at the trial, and in fact the leading actor throughout the many years, because of his relationship with the erection and operation of the Webster Theatre, and now the real principal in this lawsuit, because all the stock of the plaintiff is now owned by him and his wife, was

Max Fogel. The import of his testimony, particularly when examined by his own lawyers, was to paint an agonizing picture of a victim crushed in the beginning and never allowed to rise again with his neighborhood theatre, the Webster, throughout the many years, except at the whim of the Schine interests and always bludgeoned by their monopoly and buying power, discussed by the United States Supreme Court in 334 U.S. 110, 115, 118, 68 S.Ct. 947, 92 L.Ed 1245. This portrayal, and it was quite interesting, provoked a robust, slam-bang defense at the trial and resulted in lengthy defense briefing and much of the simplicity from the plaintiff's viewpoint began to vanish.

A general review of the history of the Webster Theatre, the relations of Schine and Fogel with it in its topsy-turvy existence through the years amidst numerous corporate name changes seems important to this decision.[1] Max Fogel, who had experience in the theatre business from 1921, built the Webster Theatre in 1927 with other investors about six blocks away from the State Theatre, which had been newly built by Schine approximately a year before in 1926. There is little difference in the construction of the State and Webster, but important difference in location. There is an episode at this time of the construction of the Webster Theatre which varies through the years in its description and changes with the retelling, depending on the person who recalls it. It concerns a threat by J. Myer Schine at this time to the persons building the Webster that the location of the Webster was too near the State and he would build a theatre near another theatre, the Murray, owned by them in Rochester, if they persisted. This episode was made a specific finding by Judge Knight. Finding of Fact 11(h) of the Amended Findings of the District Court, W.D.N.Y., dated March 29, 1946; Schine Chain Theatres, Inc., v. United

1. R shall denote the references to the transcript of this trial. Plaintiff's exhibits are numbered and defendants' lettered. Transcript of Record is reference to the record in United States v. Schine, D.C.W.D.N.Y., 63 F.Supp. 229.

States, supra. The finding is not a very determinative one because it merely states both versions as to the presence or absence of threat and seems to be one of the ambiguous findings allowed to stand by the Supreme Court because of the record as a whole and the support received from other findings to conclude unlawful purpose. Schine Chain Theatres, Inc., v. United States, 334 U.S. 110, at page 119, 68 S.Ct. 947, at page 952. This episode became further enmeshed and confused in the affidavit given by Fogel to the government in 1939 (Exhibit 5) and the recanting affidavit given to Schine in 1940 (Exhibit 4), both in evidence at this trial, concerning which Fogel freely admits now and marks in red on Exhibit 4, much he says was false. On the trial in 1957 Fogel elaborated further on this episode in 1927 testifying that J. Myer Schine said, in effect: "You have no right to build the Webster" and that Schine would not only build the other theatre but said he would see that Fogel and his associates would not get pictures for either of their theatres, and that Schine concluded it all by demanding 50% interest in the Webster. (R. 36–40). Whether Fogel and his associates succumbed to the blackjack as he wants believed, or whether he followed the old and practical adage: "If you can't beat them, join them", and thought a little monopoly his way would not be too bad, the arrangement was made and Schine took over a 50% interest in the new operating company of the Webster Theatre which continued from 1927 until 1933. In 1933 the Schine interest, as Fogel puts it, "just dropped his part of the theatre, dropped out". (R. 42). Then, to hasten the review of this background, Fogel stayed with the Webster Theatre through varied operating companies, always as manager, with a substantial interest in ownership until 1940. In the Fall of 1940, Schine picked up the mortgage on the Webster and another theatre and came into full control and operation of the Webster until the Spring of 1942. During this period Fogel became an employee of Schine, managing a Rochester theatre of Schine and booking pictures for Schine for theatres in the Rochester area. The picture painted by Fogel is again that this was done under the crushing heel of the Schine monopoly, and he became the poorly paid employee who lost his theatre as a result of continued greed. Such pathos is not too well supported and is seriously contradicted by important evidence in the record of this trial. In any event, in 1942 by reason of a consent order entered in the District Court for the Western District of New York (Exhibit 7), Fogel with others reacquired the Webster from Schine and conducted it with varying degrees of ownership, finally to full ownership by him and his wife at a time during the period of claimed damage, June 20, 1942 to May 10, 1950. Many elements in this sketchy background are not important at all in the disposition of this suit because the narrow question at hand is knowing conspiracy and monopoly between Schine and its alleged co-conspirators in the distribution of motion pictures to deprive the Webster Theatre from first neighborhood run during the years 1942 to 1950, to the financial detriment of the Webster Theatre. There are many specifics in the evidence which apply directly to this limited question and allow reasonable conclusions, and I am old-fashioned enough to attempt to decide the problem on the record made before me, keeping the all-encompassing conspiracy principle within the bounds of the proof submitted.

The most turbulent issue in the lawsuit is the offer in evidence, upon which I reserved decision, of the consent decree dated June 24, 1949, signed by Judge Knight and consented to as a judgment by the government representatives and the Schine representatives (Exhibit 12 for Id.). I am sure that few exhibits in the history of litigation have drawn so much discussion and briefing as to its admissibility. The defense is one of depth with much substance at the various barricades as to

competence and relevance. Of course, this decree was consented to at a time when a stillness in the Western District of New York existed in the Schine litigation and to give it effect and sense under Section 5 of the Clayton Act (15 U.S.C.A. § 16) it must be related back to the judicial dispositions in the original government litigation against Schine.

In the amended findings in the government case dated March 29, 1946, Judge Knight found as part of Finding 13: "He (Schine) was able to monopolize the first neighborhood run in Rochester even though the physical facilities of the independents were better." (Vol. 4, page 3219 Transcript of Record). Upon review in 1947, the Supreme Court affirmed the judgment of the District Court in part and reversed it in part and remanded the cause to it for further proceedings in conformity with its opinion. Schine v. United States, supra, 334 U.S. at page 130, 68 S.Ct. at page 958. From my reading of this Supreme Court opinion at page 117 of 334 U.S., at page 951 of 68 S.Ct. this finding seems to be allowed to stand as one supported by substantial evidence, and therefore, in my judgment, was not left open for determination upon remand and should be accepted as judicially settled. See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, page 543, footnote 11, 74 S.Ct. 257, at page 261, 98 L.Ed. 273. The finding, in my judgment, dovetails into the situation here and to reject it as the defense argues because the evidence in the case and the finding itself does not blueprint the Webster Theatre would unreasonably minimize the "large advantage" to be rendered the private litigant of the prima facie effect of the criminal judgment under Section 5 of the Clayton Act. Emich Motors Corporation v. General Motors Corporation, 340 U.S. 558, 568, 71 S.Ct. 408, 414, 95 L.Ed. 534. Even though the Emich authority limits such estoppel under Section 5 to questions " 'distinctly put in issue and directly determined' in the criminal prosecu-

tion", if the mold of this general finding does not cover our situation because not exact enough, we surely would have, I believe, the "niggardly construction" cautioned against by Chief Judge Clark, dissenting in Eagle Lion Studios, Inc., v. Loew's, Inc., 2 Cir., 248 F.2d 438. It seems impossible in the massive cases brought by the government to curb monopoly to itemize every business entity that did suffer from such unlawful monopoly. If such particularization were necessary for the provisions of Section 5 to operate, then the benefits intended by that Section would be definately curtailed by such reasoning. However, the better reasoning seems clear that such decrees are allowed as prima facie evidence of a general conspiracy with the necessary relation shown to the local area and the particular business interest alleged to be harmed by the impact of the broad, unlawful monopoly. Emich v. General Motors, supra; DeLuxe Theatre Corp. v. Balaban & Katz Corp., D.C., 95 F.Supp. 983, 986. At least it is clear that in the government case against Schine the "question" of first neighborhood run in Rochester was put in issue and directly determined at least in a general sense by Finding No. 13 of the amended findings by Judge Knight in 1946. Under my reasoning, this consent decree offered seems to be comfortably within the concept of estoppel set forth in Section 5 and should not be disqualified from reception in evidence for that reason.

Next, the defense contends that under the terms of Section 5 the decree should not be received because it is entitled "Consent Decree as to Schine Defendants". The statute does except from its operation such form of consent judgments or decrees "entered before any testimony has been taken." No matter how we blink our eyes or concede the attempt of clever draftsmanship to wipe out the past and let bygones be bygones, surely lengthy testimony remains in existence, and upon such testimony, findings and conclusions were made by the District Court which at least in part

received the sanction, and there must be some finality about it, of the highest court in the land. This consent decree recited the previous judgments of the District Court, and in the introductory recital the District Court did not disown the previous parts of its original decree affirmed by the Supreme Court, and it would seem impossible for it to do so. This recital is to the effect only that no testimony was taken upon the issues to be determined upon remand and the consent of the defendants was "without admission by the defendants in respect to any such issue to be determined upon remand." To bar the decree because of its form would allow judicial realities to be circumvented by adroit wording after the issue has been drawn and quartered in the courts. On this contention of defense to the admission of the exhibit I am inclined to the reasoning set forth in DeLuxe Theatre Corp. v. Balaban & Katz Corp., D.C., 95 F. Supp. 983, 986; Don George, Inc. v. Paramount Pictures, Inc., D.C., 111 F. Supp. 458, 468; Homewood Theatres, Inc., v. Loew's, Inc., D.C., 110 F.Supp. 398, 409; and the suggestion in Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, footnote 11, at page 543, 74 S.Ct. 257, at page 261, 98 L.Ed. 273.

■ However, despite this inclination to receive the decree in evidence, there is serious question involved as to its relevancy because of the time period of the claim. The plaintiff, as it must, limits the period from June 20, 1942 to May 10, 1950, and settles down the money damages requested to an estimate of $132,855.52, to be trebled, lessened by a $28,000 settlement made by the distributors in 1948, making final computation of requested damages in the amount of $370,566.56. The difficulty is present because nothing in the English language could be plainer than that the District Court in the government case against Schine expressly confined its findings to activities prior to May 19, 1942. It was stated thus in the amended findings of the late Judge Knight, March 29, 1946:

30. "All findings made herein with respect to any acts committed by the defendants or any of them, or any course of conduct pursued by them which the Court holds to be in violation of the antitrust laws are limited to acts committed or course of conduct pursued prior to May 19, 1942, plaintiff's counsel having stated at the opening of the trial that he would not offer evidence beyond that date."

Surely, this must mean what it says, and makes untenable the plaintiff's contention that the consent decree signed in 1949 stretches the prima facie principle of evidence through the years from 1942. The finding is absolute that such is not to be done. I shall overrule the varied objections of the defendants and admit the decree only as prima facie evidence of the conspiracy covering the Rochester area in relation to first neighborhood runs and existing only during the period involved as specifically set forth in the finding until May 19, 1942. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., supra, 346 U.S. at page 541, 74 S.Ct. at page 259.

■ I have labored much on this subject, probably too much, but it is caused by the stress placed upon this issue, particularly by the defense, and the fact that the proposition is such a debatable one in the courts. Also because without it the case of the plaintiff would be hanging in mid-air with little foundation, if any. I am frank to say that if I am in error as to the ground to be covered by the decree as to the time element, I still would be unable if I stretched the prima facie impact and conspiracy background of the decree to 1950 to infer conspiracy directed against the Webster by the defendants and the alleged co-conspirators, the distributors, during the claimed damage period from the evidence developed in the whole record. Such decree as admitted is only prima facie evidence of the alleged conspiracy, not conclusive.

Fifth & Walnut, Inc., v. Loew's, Inc., 2 Cir., 176 F.2d 587, 590; Dipson Theatres, Inc., v. Buffalo Theatres, Inc., 2 Cir., 190 F.2d 951, 957–958.

The position of the plaintiff is that the Schine interests by the unlawful use of monopoly buying power of films prevented the plaintiff from competing with Schine in the business of exhibiting motion pictures on the first neighborhood run in the City of Rochester. The pivot for this assertion is the undisputed fact that during the years 1942–1950 it is true that the State Theatre of Schine played the pictures for the neighborhood in every instance ahead of the Webster of the plaintiff (Exhibit 13). It is also true that during this period the State made more money than the Webster. (Exhibits A, X). From these isolated facts without more, the plaintiff urges that together with the decree, which I have limited, the streamers of conspiracy must flow with no regard to the conduct of the parties or the surrounding circumstances. The motto seems to be: We have the decree, we have the theatre, we do not have as much money as we should, and finally, we must have been hurt by unlawful monopoly. This, to me, is not only bad logic but bad law. Of course, it is difficult in these cases to bring in photographs of the conspiracy in operation, but reliance must be had upon the reasonable inferences drawn from the conduct in the light of the surrounding circumstances, and there must be some relation of the impact of the conspiracy to a particular theatre. Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc., 2 Cir., 176 F.2d 594, 596, 598; Emich v. General Motors, supra, 340 U.S. at pages 570–571, 71 S.Ct. at pages 414–415; Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., supra, 346 U.S. at page 543, 74 S.Ct. at page 260. The evidence of the plaintiff will not allow me to draw the inference that a knowing conspiracy continued and existed to deprive the plaintiff of first neighborhood runs in Rochester, but together with this failure of proof of alleged conspiracy and unlawful monopoly

there are countless factors in the proof that tend the other way, i. e., that under the circumstances present it was reasonable business practice proven throughout the years that the State as a better customer should run previous to the Webster and this arrangement was accepted by Max Fogel and his plaintiff corporation with the benefit to them of lower rentals. Fanchon & Marco, Inc. v. Paramount Pictures, Inc., D.C., 100 F.Supp. 84, 89, affirmed 9 Cir., 215 F.2d 167, certiorari denied 348 U.S. 912, 75 S.Ct. 293, 99 L. Ed. 715; Dipson Theatres, Inc. v. Buffalo Theatres, Inc., 2 Cir., 190 F.2d 951, 957–958, certiorari denied 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691.

Formidable among these facts in the evidence is that agreed to by Fogel that when the Webster and State split the first neighborhood run in the 1927–33 era, when Schine was a partner, the Webster lost money (R. 49, 50, 147, 158, 162, 165), and finally in this period the operating company of the Webster was dispossessed for failure to pay rent. (R. 166). Then, it is clear that when the Schine interests took over the Webster in the 1940–1942 period the arrangement was continued by Schine to have the State play the neighborhood run ahead of the Webster (R. 106–107). To reason with the plaintiff at this time it would be necessary to conclude Schine was conspiring and monopolizing against his own interest. I am not convinced at all that Schine was champing at the bit to get back the Webster in 1940 because the record indicates to me that Fogel, during this period, was always the moving party and persistent in his efforts to interest Schine again in the Webster. (R. 175, 179; Exhibits G, H, I, AA). The temporary order agreed to by the defendants in 1942 (Exhibit 7) with detailed prohibitions to refrain from certain practices, and giving access to their records by the government, together with the same type agreed to by the distributors in 1941, must be given great weight in the consideration of whether these people were bold enough to continue this

alleged conspiracy of unlawful monopoly in this small neighborhood of Rochester. At least, it places further burden upon the plaintiff to prove by evidence of quality such situation continued in the face of this government pressure and supervision, with the tremendous power to search for illegality in the corporate records. Such evidence is lacking, and it must be realized that after a period of seven years that this case has been at issue, with the liberal and settled pretrial procedures of discovery and interrogation in this federal court, there is only one letter produced with any significance to the issue of intentional collaboration and agreement, and that is an equivocal one. (Exhibit 14).

The most striking impression I gain by a review of the record is the attitude of Max Fogel himself as to whether or not he considered, under the circumstances, that the Webster should precede the State in the matter of neighborhood first run. The record does not disclose that he made any protest at all during the 1933–1940 period. From 1942–1950 the impression stands out—and I say it with all charity—that he was sitting on the sidelines with his Webster Theatre waiting to be conspired against and willing to watch his lawsuit grow. If any one during these years knew the complaint department he did, because he had, according to his own testimony, a most serious and intimate contact when he says he told the government lawyers in Washington that Schine forced him to recant the previous government affidavit and give a false one in order to regain the Webster. He was out of the clutches of Schine after he regained the theatre, he sat through the government case in court against Schine although not called as a witness, and it would be incredible to infer that if he thought he were being wronged by deprivation of first run he would not protest to the nearest government attorney. His testimony that he did make demands upon certain branch managers, which he was allowed to state upon a reopening of his case, was hazy, casual and not too persuasive to me, and

I evaluate it in such manner because of the many inconsistencies in other parts of his testimony. (R. 70, 91, 130, 149; 153, 158, 165, 198, 219, 225, 251, 257; 299). Surely a person wronged as Fogel claimed to be during this long period by an arbitrary and unlawful deprivation of first run which he wanted, would have indulged in some letter writing both to Schine and the distributors setting forth his complaint. See Milgram v. Loew's, Inc., 3 Cir., 192 F.2d 579. All we have is the meaningless Exhibit 14, which was a letter to Fogel from a distributor, to which he made no answer or complaint about the arrangement or other arrangements. Also to be considered on the important attitude of Fogel as to whether he really wanted first run and the increased rental expense is the fact that when he settled with the distributors in 1948 he did not even then request or demand a run ahead of or equal with the State Theatre, but was satisfied with a slight advance in his schedule after the State.

Whether the demand element is as vital to this lawsuit as set forth in Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 190 F.2d 561, certiorari denied 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680, is not necessary for this decision because I consider the lack of it only as again indicative of the fact that the plaintiff operator himself accepted the first run set-up as it existed without protest, thereby giving good intimation that the arrangement was neither conspiratorial nor monopolistic. See J. J. Theatres, Inc. v. Twentieth Century-Fox Film Corp., 2 Cir., 212 F.2d 840, 845. Congress Building Corp. v. Loew's, Inc., 7 Cir., 246 F.2d 587, agreed with the demand requisite as applied in this sense when it elaborated on the Milwaukee Towne Corporation case.

The testimony of the top men in the distribution part of the movie industry was unhesitatingly to the effect that the State was a better theatre for the location and revenue than the Webster and this testimony was also reliable and

factual, as was that of McKay, then general counsel for Schine, that there was never any agreement or meeting of the minds to deprive the Webster of first neighborhood run if it wanted it. If it is considered important to this decision, the testimony of White, an exceptionally capable manager for Schine, establishes that efficient and warmhearted management can produce higher gross without the priority of first run when matched against a neighborhood theatre; the comparison being the Webster and the Dixie of the Schine interests. (R. 480–518, Exhibit V). Frankly, with my view of the record and the disposition I make I do not think it necessary to go in so deep.

This opinion shall constitute my findings of fact, and my conclusion in favor of the defendants is made because: (1) there is not sufficient showing by the plaintiff in the evidence that the defendants, by the unlawful use of monopoly buying power of film, and the alleged co-conspirators, agreed and conspired in the 1942–1950 period to arbitrarily deprive the Webster from first neighborhood run or the right to compete for first neighborhood run in the City of Rochester; (2) the conduct of the parties in the operation of the two theatres, the Webster and the State, and the circumstances surrounding their operation and the evidence as a whole rebuts any presumption or inference of conspiracy afforded by the consent decree in the government case, particularly during the claimed damage period from 1942–1950; (3) there was no demand or request by the plaintiff for first run neighborhood pictures and the evidence indicates a willingness and contentment to follow the State at the lower rental for the second neighborhood run; (4) there is no credible evidence to convince that the Webster was clearly a better customer from the distribution point of view than the State and that a different pattern of distribution would have been more to the interests of the distributors and thus allow an inference of conspiracy (Dipson v. Buffalo, supra, 190 F.2d at pages 957–958); (5) the proof is not sufficient to infer or conclude as charged in the complaint that the defendants, during the years 1942–1950 conspired, combined, or conspired among themselves or with any of the alleged co-conspirators, or with others, to violate the antitrust laws by unlawful restraint and monopoly.

Judgment shall enter in favor of the defendants dismissing the complaint upon the merits. See Matteson v. United States of America, 2 Cir., 240 F.2d 517.

It is so ordered.