EAGLE LION STUDIOS, Inc., Eagle Lion Films, Inc., PRC Productions, Inc., Chesapeake Industries, Inc., Plaintiffs,

v.

LOEW'S, Inc., RKO Theatres, Inc. and RKO Film Booking Corp., Defendants.

United States District Court
S. D. New York.
June 11, 1956.

James L. O'Connor, New York City, for plaintiffs, William L. McGovern, Robert L. Wright, Seymour Krieger, Washington, D. C., of counsel.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for defendant Loew's, Inc., S. Hazard Gillespie, Jr., Stuart Marks, Francis W. Phillips, New York City, of counsel.

O'Brien, Driscoll & Raftery, New York City, for defendants RKO Theatres, Inc.

and RKO Film Booking Corp., Edward C. Raftery, George A. Raftery, William F. Whitman, New York City, of counsel.

DAWSON, District Judge.

This is an action tried by the Court without a jury wherein the plaintiffs seek treble damages under the anti-trust laws, 15 U.S.C.A. §§ 1, 2, 15, against Loew's, Inc. (hereinafter called "Loew's") and RKO Theatres, Inc. and RKO Film Booking Corp. (hereinafter called "RKO").

### Proceedings Prior To Trial.

The complaint was filed on October 3, 1950. It named as defendants all of the distributor defendants named in United States v. Paramount Pictures, Inc.[1] (hereinafter called the "Paramount case"). As to the distributor defendants, it sought injunctive relief. As to the present defendants, it sought injunctive relief and treble damages in the amount of $15,000,000 plus attorneys' fees.

In the original complaint, Eagle Lion Classics, Inc. was named as one of the parties plaintiff. In 1951, this corporation was sold to United Artists Corp., one of the distributor defendants. Following a settlement of disputes which arose over the contract of purchase, Chesapeake Industries, Inc., the parent corporation among the plaintiffs, gave United Artists a release on December 31, 1953. Thereafter, on the defendants' motion, Judge A. N. Hand dismissed the complaint, Eagle Lion Classics, Inc., v. Loew's, Inc., D.C., 121 F.Supp. 128, on the grounds that the sale of Eagle Lion Classics, Inc., the only party plaintiff threatened by the conspiracy, made the claim for injunctive relief moot, and that the claim for damages against the exhibitor defendants had been released by the release of one joint tortfeasor without reserving rights against the others. The plaintiffs appealed the dismissal of the complaint, insofar as it related to the

damage claims. The Court of Appeals reversed on the ground that none of the claims for damages was the subject of the release, 2 Cir., Feb. 1, 1955, 219 F.2d 196. This action, therefore, involves only the claim for damages against the two remaining defendants, Loew's and RKO.

### The Issues.

The complaint is based exclusively on alleged violations of the anti-trust laws. The issues were framed in a pre-trial order entered by Judge Ryan of this Court on November 2, 1953. Such issues must, in the absence of modification, control the subsequent course of the action, Calendar Rule 18, S.D.N.Y. The issues as set forth in the pre-trial order are as follows:

"1. Did the defendants combine and conspire in violation of the anti-trust laws of the United States to exclude the plaintiffs from the opportunity of licensing on a competitive basis their feature motion pictures to Loew and RKO theatres which exhibit feature motion pictures in the New York metropolitan area on runs subsequent to first run Broadway?

"2. If so, were the plaintiffs directly damaged in their business or property as the result of the said illegal combination and conspiracy and, if so, in what amount?"

### The Facts.

#### 1. *The Parties.*

There are four affiliated parties plaintiff (referred to herein as "the plaintiffs") to the present suit:

Eagle Lion Studios, Inc.—a California corporation engaged in the business of producing motion pictures up to 1949;

Eagle Lion Films, Inc.—an Ohio corporation engaged in the business of distributing the films produced both by its affiliate (above) and by other

---

1. D.C.1946, 66 F.Supp. 323, 70 F.Supp. 53, reversed and remanded in part, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260;

1949, 85 F.Supp. 881, affirmed 1950, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380.

producers from 1945 until June, 1950;

PRC Productions, Inc.—a Delaware corporation organized in 1943 and engaged in the business of producing motion pictures until 1946 when all of its assets were transferred to Eagle Lion Studios, Inc., above; and

Chesapeake Industries, Inc. (formerly Pathe Industries, Inc.)—an Ohio corporation which owns all of the stock of the other three parties plaintiff.

There are at present three defendants:

Loew's, Inc.—a Delaware corporation, now engaged in the business of producing and distributing motion pictures and formerly, at the times material to this action, engaged in the exhibition of motion pictures in theatres owned or controlled by it either directly or through subsidiaries;

RKO Theatres, Inc.—a New York corporation engaged in the business of exhibiting motion pictures in theatres owned or controlled by it; and

RKO Film Booking Corp.—a New York corporation engaged in the business of booking films for exhibition.

Originally there were six other defendants, all nationwide film distributors, but the action was dismissed as to them.

The defendants are corporations which operate those motion picture theatres in metropolitan New York which are known, respectively, as the Loew's and RKO circuits.

## 2. Area involved in the action.

The New York metropolitan area, which under the pretrial order is the area involved in this action, is defined in the complaint as "the five boroughs of greater New York City, southern portion of Westchester County and western portion of Nassau County, New York State". No part of the State of New Jersey is included in the New York metropolitan area, as defined in the complaint and in the interrogatories submitted by the plaintiff.

## 3. Period of time involved in the action.

The complaint alleged that the conspiracy which caused it damage began prior to 1944, but it was stipulated that the only claim for damages was in the period from September 1, 1946 to September 1, 1950. The action was instituted on October 3, 1950.

## 4. The activities of the plaintiffs prior to September 1, 1946.

In 1943, PRC Productions, Inc. was created to produce low budget pictures, and PRC Pictures, Inc. was created to distribute those low budget pictures. In 1946, PRC Pictures, Inc. was dissolved, and its distribution activities were assumed by Eagle Lion Films, Inc. and its assets were transferred to Eagle Lion Studios, Inc. In that year, the parent company, Chesapeake Industries, Inc. (then known as Pathe Industries, Inc.) decided to make and distribute higher budget pictures, and determined that its subsidiary, Eagle Lion Studios, Inc. would produce them and Eagle Lion Films, Inc. would distribute them. This was in part because of the fact that in 1945, an informal agreement was reached with the J. Arthur Rank organization of England which provided, in effect, that Chesapeake Industries, Inc. would produce a minimum of five pictures a year for distribution by the J. Arthur Rank organization in England and other areas, and that the English company would produce five pictures to be distributed by Chesapeake Industries, Inc. or its affiliates. This agreement was reached informally in 1945.

In September, 1946, Chesapeake created Eagle Lion Films, Inc. to distribute the pictures in accordance with this contract, and in November, 1946, created Eagle Lion Studios, Inc. to produce the pictures. The agreement with the J. Arthur Rank organization was not formally signed until April 18, 1947. Eagle Lion Studios, Inc. was put into funds to take

over the production facilities of a studio in Hollywood, California, and a million and a half dollars was invested to put it in condition to make these pictures. Eagle Lion Studios, Inc. continued to make some low budget pictures and some westerns, but also embarked upon a program of making some more expensive pictures.

During all of the years from 1946 through 1951, plaintiffs' motion pictures activities resulted in a loss. This loss, however, was not merely in the distribution of pictures. The figures introduced in evidence showed that in this five-year period, the average annual loss of the plaintiffs was $2,271,573 in its production activities, and $495,425 in its distribution activities. These figures represent plaintiffs' activities on a worldwide basis. This action is merely limited to the situation in the New York metropolitan area and in connection with the licensing of pictures on runs "subsequent" to first run theatres.

### 5. *Subsequent run theatres.*

"Subsequent run" means all theatres except the approximately 40 first run theatres principally concentrated in the Broadway midtown area and includes first subsequent run, second subsequent run, and so forth. The total number of subsequent run theatres in the area involved and in the period involved has been variously estimated at from 600 to 800. Subsequent run theatres are frequently called "neighborhood theatres".

Of these subsequent run theatres, there were during 1946–1950 operating on a first neighborhood run basis some 44 or 45 theatres belonging to Loew's, some 31 to 36 theatres belonging to RKO, and some 17 others. Loew's also operated 13 or 14 second neighborhood run theatres, and RKO operated from 1 to 3 second neighborhood run theatres. First run neighborhood theatres were theatres which ordinarily displayed the pictures following a run in the first run theatres. However, there were times when pictures would be shown in the first run neighborhood theatres even though they

had not been shown in first run theatres. The plaintiffs have not complained of any discrimination against their pictures in the first run theatres, but base their complaint solely upon the failure to license their pictures for the first run neighborhood theatres of the RKO and Loew's chains.

In addition to the Loew's and RKO circuits, there were in 1948 seven other subsequent run circuits in the area comprised of between 29 and 78 theatres each and totaling altogether some 252 theatres.

In the event that a picture did not play on a first neighborhood run circuit, it became that much more difficult to play in subsequent run theatres. By the same token, if a picture did not play in a first run theatre in the Broadway area, it became that much more difficult to secure a commitment for the showing of the picture on the first neighborhood run circuit.

In addition to the theatres above described, there was another group of theatres known as the "art" theatres which customarily played single films instead of double features, usually at a higher admission charge than a first run neighborhood theatre, and frequently played foreign films.

### 6. *Films distributed by the plaintiffs.*

In the period in question, there were distributed by the plaintiffs 195 pictures; one picture "Red Shoes" was distributed twice so that in some of the evidence, the total is given as 196 pictures.

### 7. *Method of selling pictures.*

The general procedure for selecting pictures to be exhibited either on the circuits or in individual theatres is for the company which is distributing them to make arrangements for the exhibition of the picture in a projection room maintained by the exhibitor. These exhibitions are known as "screenings". Thereafter, the exhibitor discusses the terms that it is willing to pay for the picture and how the picture is to be displayed,

and negotiations take place for the price to be paid for the picture. The circuits in the New York metropolitan area customarily had changes of pictures twice a week. Some pictures were shown on the "long half" which meant that the picture played approximately five or six days a week, and some played on the "short half" which meant that the picture played one or two days of the week. Generally, two pictures were played together with one receiving "top billing". Sometimes the two were given equal or "split billing". Ordinarily the distributor received a percentage of the gross admissions receipts only for the pictures playing the top of the long half, or a split billing of the long half. For the rest it received a flat rental and this was regarded as less favorable.

### 8. Screenings of the pictures distributed by the plaintiffs.

The undisputed testimony was that of the 195 pictures distributed by the plaintiffs in this period, Loew's "screened" not less than 108 pictures and RKO "screened" at least 129 pictures. No contention has been made that the defendants refused to "screen" these pictures with a view toward seeing whether they would be purchased by them. Plaintiffs concede, for example, that defendants "screened" all of plaintiffs' pictures made available to it for that purpose.

### 9. Eagle Lion Pictures exhibited by the defendants.

Of the 195 pictures distributed by the plaintiffs during the period in question, the defendants exhibited 85 pictures on one or the other of its circuits in the New York metropolitan area. The playing terms of the 85 were as follows:

| | |
|---|---|
| No. played long half top or split billing | 8 |
| No. played long half second billing | 24 |
| No. played short half | 53 |
| Total | 85 |

Each of the defendants exhibited certain other pictures distributed by the plaintiffs in one or more theatres amounting to less than the full circuit. Loew's played some 39 additional pictures in addition to the 50 which it played on the entire circuit. RKO exhibited in one or more of its theatres during the period in question some 55 additional pictures. The evidence shows that during the period in question, Loew's licensed pictures from 38 distributors and RKO licensed pictures from over 30 distributors.

### 10. Sale of plaintiffs' distribution business.

Plaintiffs, throughout their entire history, have been weak companies. During the years 1946 through 1951, the plaintiffs lost over $13,000,000 in the production of films and nearly $3,000,000 in the distribution of films. These losses were admittedly not the result of any competitive situation which might have existed in subsequent run theatres in the greater New York metropolitan area. Plaintiffs contend that their damages in that area would have been only $417,000.

As a matter of conceded fact, plaintiffs had enough pictures to operate at a profit only during the last six months of 1950 when Eagle Lion obtained a substantial number of additional pictures through merger negotiations with Film Classics. The additional revenue from these additional pictures "began to die out" early in 1951, as stated by the President of Chesapeake Industries, Inc., and the distribution business was sold to United Artists Corporation. The loss on this sale was computed by the accountant called as a witness by the plaintiffs as $146,440.

Although plaintiffs had been losing money throughout their entire history, the amount of total gross film rentals which they received was not insignificant. In the seasons 1946–1947 through 1949–1950, plaintiffs earned total gross film rentals on the 195 films which they distributed of $39,107,800 in the domestic market, of which $2,362,200 was received from neighborhood theatres in the greater New York metropolitan area.

**11.** *Nature of the Eagle Lion pictures.*

The 195 Eagle Lion pictures included about 40 "Westerns", 43 foreign films which were made abroad, and 26 re-issued films. A re-issued film is one which has been distributed through the Country and which is later released, at the discretion of the distributor, for further distribution and exhibition. A re-issued film was ordinarily not played on a first neighborhood run basis. Few of the foreign made Eagle Lion films were shown in the circuits of the defendants. These films were customarily shown in the so-called "art" theatres not affiliated with either circuit. However, all foreign made Eagle Lion films grossing less than $500,000 took 13.2% of their total domestic rental out of neighborhood theatres in the New York metropolitan area, which was substantially greater than the percentage of rental received from this area by all Eagle Lion films.

**12.** *Ratio of subsequent run rental from metropolitan New York to national film rental.*

The ratio of subsequent run rental from metropolitan New York to national film rental, less such subsequent run rental, was as follows:

## Eagle Lion

| No. of Pictures | Pictures with National Film Rental | Ratio of Metropolitan Sub-run Rent to National Less Metropolitan Sub-run Rent |
|---|---|---|
| 97 | Under $100,000 | 6.9% |
| 51 | 100,000 to 200,000 | 5.4% |
| 10 | 200,000 to 300,000 | 6.7% |
| 16 | 300,000 to 400,000 | 5.9% |
| 3 | 400,000 to 500,000 | 8.6% |
| 18 | Over 500,000 | 6.7% |
| 195 | | 6.4% |

## 8 Distributors [2]

| No. of Pictures | Pictures with National Film Rental | Ratio of Metropolitan Sub-run Rent to National Less Metropolitan Sub-run Rent |
|---|---|---|
| 7 | Under $100,000 | 5.2% |
| 10 | 100,000 to 200,000 | 4.9% |
| 7 | 200,000 to 300,000 | 6.6% |
| 6 | 300,000 to 400,000 | 5.1% |
| 5 | 400,000 to 500,000 | 7.1% |
| 61 | Over 500,000 | 9.2% |
| 96 | | 8.9% |

2. These were not all the films distributed by the 8 distributors in the four-year period, but were median pictures selected as representative of the entire distribution by the plaintiffs in preparing their statistical studies.

### 13. *Pictures available for exhibition.*

The circuit of each defendant used only about 104 features per year as its long half attractions, being two features per week per circuit. The eight major distributors distributed, in the four year period, over 1,000 features, or more than 250 features per year. Eagle Lion distributed in that four-year period a total of 195 pictures.

### Discussion.

The primary issue in this case is, in the language of the pre-trial order,

"Did the defendants combine and conspire in violation of the anti-trust laws of the United States to exclude the plaintiffs from the opportunity of licensing on a competitive basis their feature motion pictures to Loew and RKO theatres which exhibit feature motion pictures in the New York metropolitan area on runs subsequent to first run Broadway?"

No proof was offered that plaintiffs were entirely excluded from licensing their pictures to these theatres in that area. As has heretofore been shown, many of their pictures were in fact licensed for exhibition to the Loew's and RKO circuits in New York. The only question would be whether plaintiffs were excluded from the opportunity of licensing such pictures "on a competitive basis". This would involve the question as to whether, in the licensing of their pictures, plaintiffs were discriminated against so that they did not have an equal competitive opportunity.

Plaintiffs offered no direct proof that there was, in fact, any combination or conspiracy between the defendants to deprive the plaintiffs of an equal competitive opportunity to license their films. The presidents of both defendants denied explicitly that there was any agreement between the defendants relating to the licensing of pictures of the plaintiffs or that either of them knew about the negotiations which the other had with reference to licensing pictures from the plaintiffs. Plaintiffs offered no testimony of any of their sales executives with reference to efforts made to secure licensing of pictures distributed by them during the period covered in the complaint from which any inference could be drawn that they were discriminated against. The only testimony of an officer of the plaintiffs was the testimony of Mr. MacMillen, the president of Chesapeake Industries, Inc., who stated that he "personally had nothing to do with the sale or distribution of pictures to the exhibitors", but who testified that after the decree had been entered in United States v. Paramount Pictures, Inc., in the first part of 1950, he went to the offices of the defendants and complained about discrimination, saying to the president of RKO "that unless we got competitive access to the circuit we would have no alternative but to bring a suit for damages under the antitrust laws." Whether this was a threat to secure better terms in the future from the defendants or whether it was a justifiable complaint certainly does not appear from the testimony of Mr. MacMillen who admitted that he knew nothing about the sale and distribution of pictures.

If plaintiffs had been discriminated against in the competitive licensing of their pictures to the defendants, it is strange that some testimony was not produced by the plaintiffs from those persons who had been its officers and agents in the period covered by the complaint to show what efforts they made to get specific pictures exhibited by these defendants and what the results were of such efforts. No such evidence was introduced. In fact, plaintiffs admitted that they had no complaint as to their treatment on any particular picture.

The defendants, on the other hand, called as their witness Max Youngstein, who had been in charge of "advertising, publicity and exploitation" for plaintiff Eagle Lion Films for two years from 1946. His testimony did not indicate that the treatment of plaintiffs' pictures on the circuits of the defendants was due to any effort of the defendants to deprive

plaintiffs of a competitive position. He stated that the poor returns on plaintiffs' pictures was due to the fact that the films of the plaintiffs were, from the standpoint of box office appeal, at "the very bottom rung of the ladder" and "much inferior" to films which were being offered by other distributors.

The plaintiffs did not establish that they were excluded from either of the circuits or that their pictures were allocated as between the circuits. Nor have they produced any evidence which would indicate that one of the defendants consulted with the other with reference to the exhibition of plaintiffs' pictures. Plaintiffs have had several years to prepare this case for trial and ample opportunity to invoke the discovery processes of the Court, and if any such evidence was available, it may be assumed that plaintiffs would have secured it.

Plaintiffs, in the absence of direct proof that there was a combination or conspiracy of the defendants which deprived them of the opportunity to license their pictures on a "competitive basis", relied upon two items of proof: (1) the decree and findings of fact and conclusions of law in the Paramount case, and (2) the fact that the ratio of plaintiffs' receipts for subsequent run metropolitan New York theatres as compared to their national receipts differed from the average ratio of the eight major distributors.

■ The first question, of course, is whether the decree and the findings of fact and conclusions of law in the Paramount case established as a fact that the defendants combined and conspired to exclude plaintiffs from the opportunity of licensing their pictures on a competitive basis in the Loew and RKO circuits during the period involved in the action. Plaintiffs rely on § 5 of the Clayton Act, 15 U.S.C.A. § 16, which makes final judgments in government anti-trust suits

"prima facie evidence" in private suits. The effect of § 5 is to give the private litigant the benefit of the doctrine of estoppel by judgment as if it had been a party plaintiff to the government suit. Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 568, 71 S.Ct. 408, 95 L.Ed. 534. For this reason the Court accepted in evidence the decree in the Paramount case and the findings of fact and conclusions of law in that case.

The defendants assert that the Paramount case had nothing to do with the subject of the present action. In large part, that is true because the primary issue in that case related to the effect under the anti-trust laws of a combination between the large producers of motion pictures who also controlled, to a substantial extent, the places of exhibition of those motion pictures. Many of the findings of fact and conclusions have nothing to do with the issue in this case.

■ General findings of violation of the anti-trust laws in the Paramount case are insufficient to impose liability in the present case unless plaintiffs have introduced evidence to relate those findings to the issue in the present case. See Theatre Enterprises, Inc., v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273; Fanchon & Marco, Inc., v. Paramount Pictures, Inc., D.C.S.D.N.Y.1955, 133 F.Supp. 839, 845, 846; Fifth & Walnut, Inc., v. Loew's, Inc., 2 Cir., 1949, 176 F.2d 587, 593; Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 1952, 194 F.2d 846, 859. The plaintiffs have not supplied the deficiency by directing attention to any parts of the record in the Paramount case that show that the issue involved in this case in this area was adjudicated, Dipson Theatres, Inc., v. Buffalo Theatres, Inc., 2 Cir., 1951, 190 F.2d 951, 958.

Plaintiffs, however, specifically rely upon finding of fact No. 154(d) [3] which

3. "154(d). In New York City Loew and RKO divided the neighborhood prior run product of the various defendant distributors under a continuing arrangement so that there was no competition between

them in obtaining pictures. On one occasion where Paramount was having a long dispute with Loew's as to rental terms for Paramount films to be shown in Loew's New York neighborhood cir-

would seem to have some relationship, at least so far as the first sentence of the finding is concerned, to the issue in the present case. This sentence reads as follows:

"In New York City Loew and RKO divided the neighborhood prior run product of the various defendant distributors under a continuing arrangement so that there was no competition *between them* in obtaining pictures." (Italics supplied.)

Conclusion of law No. 16 in the Paramount case reads as follows:

"Loew's, Incorporated, has violated the Sherman Act by conspiring with RKO to monopolize and monopolizing the first neighborhood run in New York City, and by the dividing of that market between itself and RKO."

While the findings may perhaps constitute evidence (on which point the Court finds it unnecessary to pass) that Loew's and RKO had no competition between themselves in obtaining pictures from the defendant distributors who were parties to the Paramount case and had monopolized between themselves the first neighborhood run in New York City, the findings, standing by themselves, are certainly not evidence that there was no competition between Loew's and RKO in obtaining and distributing pictures of so-called "independents" such as the plaintiffs in the present case.

■ Whatever may have been the situation as between Loew's and RKO with reference to the exhibition of their products and the products of other major distributors, the evidence in this case clearly indicates that during the period

involved in the action, there was no arbitrary allocation as between the circuits of the pictures of the plaintiffs or that the defendants excluded the pictures of the plaintiffs. It does not necessarily follow from the fact that there had been an allocation of the major distributors who were defendants in the Paramount case that the product of all other independent distributors of motion pictures was allocated or that there was no competition for the product of these independent distributors. Likewise, the plaintiffs have not complained that their product was "divided" or allocated in any particular way by and between the present defendants. The evidence shows clearly that the plaintiffs were not excluded from this market. Under these circumstances, the findings of fact and conclusions of law in the Paramount case are insufficient in and of themselves to establish exclusion by any combination and conspiracy. The Paramount case did not involve the issue as to whether plaintiffs were prevented from licensing their pictures on an equal competitive basis to the defendants. Since this issue was not in that case, the decree in that case does not constitute prima facie evidence of any such ultimate fact.

In the absence of proof of actual combination or conspiracy to deprive the plaintiffs of an equal competitive opportunity, plaintiffs would have the Court draw the conclusion that there was such combination or conspiracy by a comparison of the ratio of the income received by the plaintiffs from the subsequent run theatres in New York to the income received nationally as compared to the ratio of the income received by the eight major distributors from the subsequent run theatres in New York to the income

---

cuit of theatres, no attempt was made by Paramount to lease its films to RKO for exhibition in the latter's circuit, nor was any effort made by RKO to procure Paramount films as they both evidently preferred to adhere to the existing arrangement, under which Loew's circuit consistently exhibited the films of itself, Paramount, United Artists, Columbia and half of Universal, while RKO exhibited the films of itself, Fox, Warner,

and half of Universal. Accordingly, the showing that 85% of Loew's theatres are in competition with theatres of other defendants is misleading and may properly be reduced by the exclusion of its New York neighborhood theatres. If this is done, it would give Loew a percentage of approximately 42% of its theatres in competition with other defendants in cities over 100,000."

which these distributors received nationally. In other words, the plaintiffs contend that the income which they received in the subsequent run theatres in New York, in comparison with the income received nationally and as contrasted with the similar figures for the eight major distributors, would lead to the conclusion that there had been a combination or conspiracy between the defendants to exclude them from licensing their pictures in the subsequent run theatres in New York on an equal competitive basis. Plaintiffs base this upon the hypothesis that if they did not receive for their pictures as large a proportion of income from the New York subsequent run theatres compared to their national gross income, as did the major distributors, it would show that they had been discriminated against in New York. This argument presumes, of course, that they were not discriminated against on a national basis.

Plaintiffs rely upon certain statistical studies made by them. These are combined primarily in an exhibit (Ex. 10) which sets forth two ratios prepared in part from answers to interrogatories by the defendants, including those defendants against whom the action has been discontinued. Exhibit 10 is a chart which reads:

"Ratio of Subsequent Run Rental from Metropolitan New York to National Film Rental Less such Subsequent Run Rental"[4]

"For all Eagle-Lion
Product for Seasons
1946–50

(196 Features)"

6.4%

"For Representative Product
of 8 Major Distributors for
Seasons 1946–50

(96 Features)"

8.9%

The 96 representative product pictures of the eight distributors (all defendants in United States v. Paramount Pictures, Inc.) were picked as follows: all pictures for each distributor for each of the four motion picture years from September 1, 1946 through August 31, 1950 were put in 32 separate lists in order of national rental. Then three median rentals were selected from each list: (1) the median rental for the entire list, (2) that from the top quarter of the pictures, and (3) that from the lowest quarter of the pictures.

The plaintiffs have used the difference in ratios between 6.4% and 8.9%, which is 2.5%, to calculate that by reason of discriminatory practices in the metropolitan New York area, they lost at least $417,000 in net rentals on the films distributed through the four motion picture years in question. They arrived at this sum by taking 2.5% of the difference between their total domestic gross film rentals and their New York metropolitan area neighborhood theatre gross film rentals. The resulting figure of $919,000 was reduced by subtracting a sum which represented the average share (54.6%) of the gross film rental that went to the producer. (Apparently no allowance has been made for any of the other expenses usually incident to the earning of the film rentals.)

The purpose of using ratios instead of dollar amounts to show the discriminatory effect was, as counsel for plaintiffs explained it, because the pictures of the eight major distributors "all grossed, on the average, substantially more per picture nationally than Eagle Lion did."

This chart may, on the surface, seem to be persuasive for the point contended for by the plaintiffs. However, like all statistical studies, it is necessary to see whether there has been any statistical fallacy inherent in the statistical method used. One of the most insidious of statistical fallacies is the drawing of aver-

4. Subsequent run rental, as used in Exhibit 10, includes that from all theatres except the 40 odd first run. It is not limited to rental from the defendants' theatres.

ages from a body of statistical data which is not comparable in kind or quality.[5]

There is no more insidiously persuasive, and at the same time unreliable, type of evidence than that produced by taking a group of non-comparable figures, averaging them, and then attempting to draw a conclusion from that average.[6] An analysis of the underlying data and of the problem sought to be solved must precede any statistical approach. Therefore, any good statistical analysis would seek to ascertain whether the averages, when found, would be constant throughout the run of the data, or whether the averages were the result of particular factors in the data. That is why a plotted curve is frequently a better expression of averages than a mere statement of an arithmetical average of a total of figures.[7] If the averages are not constant through the run of the data, it becomes important to ascertain what factors influenced the change in the averages.

An analysis of the data submitted in support of plaintiffs' Exhibit 10 shows that the conclusion of the plaintiffs that their pictures did poorer proportionately in the New York area, when compared to the national figures, than did the defendants' pictures, was a conclusion which was not true as to all pictures. A plotted curve would show that the ratio varied with the drawing power of the picture as evidenced by the national film rentals.

Thus, if we break down the ratios relied on by the plaintiffs into similar ratios which compare all Eagle Lion films which received national rental of $500,000 or less with the representative pictures of the major distributors which also received a national rental of $500,000 or less, and then similarly compare the ratios of pictures which received national rental of over $500,000, we get the following result:

Ratio of Subsequent Run Rental from Metropolitan New York to National Film Rental, less such Subsequent Run Rental.

| | Eagle Lion | Eight Major Distributors |
|---|---|---|
| For pictures having national rental of less than $500,000 | 6.2% | 5.9% |
| For pictures having national rental of over $500,000 | 6.7% | 9.2% |
| For entire product | 6.4% | 8.9% |

5. "In order for a comparison to yield a meaningful, logical and significant result, the two quantities compared must be of the same quality or kind and must be stated in identical or comparable units. In other words, the variables compared must differ in *quantity only* as measured in *identical units*." Blair, Elementary Statistics (Henry Holt and Company, 1944) p. 42.
6. Such as saying that if 51% of the population of the United States is male and 49% is female, an average American is 51% male and 49% female, i. e., an hermaphrodite.
7. In the field of statistical analysis, this is called "Regression", which is a comparison between two or more variables. "It ferrets out and expresses in clear, measurable terms the hidden and inner meanings of great masses of numbers which otherwise would remain unknown." Blair, op. cit. p. 230.

On pictures which had a national rental of $500,000 or less, it appears that Eagle Lion did as well as or even slightly better than the eight major distributors. It is only when we come to pictures which had a national revenue of over $500,000 that a marked disparity begins, and it is this disparity in these pictures having this greater national revenue which leads to the difference in ratios for the entire product upon which plaintiffs rely as proof of a conspiracy.

The conclusion which follows from these figures thus broken down must be that Eagle Lion did as well as the eight major distributors in pictures which grossed nationally less than $500,000, and that the eight major distributors had proportionately a greater revenue in the New York area than they did nationally only in those pictures which had a national revenue of over $500,000. We should, therefore, examine the particular pictures which grossed nationally over $500,000 to see whether an inference can be drawn that the disparity evidenced by these ratios was the result of a deprivation of equal competitive conditions from Eagle Lion, or whether it was due to other causes.

Of the 195 pictures distributed by the plaintiffs, only 18, or less than 10%, had gross national revenues of more than $500,000 while 64% of the representative pictures of the eight major distributors had revenues in excess of $500,000. Only seven of the pictures of the plaintiffs had gross national revenues in excess of $1,000,000 (and only one over $2,000,000) whereas 40 of the 96 representative pictures of the eight major distributors had gross national revenues in excess of $1,000,000, of which 18 were in excess of $2,000,000 and eight in excess of $3,000,000.

Boiling down all the statistics produced by the parties, it comes to this: 18 pictures of the plaintiffs which grossed more than $500,000 nationally did not do as well proportionately in the metropolitan New York area, as compared to what they did nationally, as the pictures of the eight major distributors that grossed more than $500,000 nationally. Was this difference due to a deprivation of an equal competitive opportunity for the plaintiffs?

All 18 of these films each had a first neighborhood run in the entire Loew's or the entire RKO circuit in metropolitan New York. Seventeen of the pictures played the long half of the week, and six had top billing. This is certainly not proof of exclusion or lack of a competitive opportunity. Nor was there any proof that these pictures were entitled to a better place on the circuits.

Is the fact that these pictures did not do as well in New York as they did nationally, even though they were displayed in the circuits, proof of lack of a competitive opportunity? The fact that they did not earn as much in New York as they did proportionately in the rest of the Country is not persuasive proof that there was discrimination against them. We must remember that we are comparing pictures of the plaintiffs which had a low national gross with pictures of the defendants which averaged nationally many times that of the pictures of the plaintiffs. We are considering two different classes of merchandise—one of a moderate grade and the other of a much higher grade—if we take their reception nationally as proof of their real worth, which is what the plaintiffs have done in using the national figures as an adequate basis of comparison.

Plaintiffs' argument would presuppose that any such merchandise, no matter what its grade, would do proportionately as well in New York as it does nationally. The economic facts of life show how fallacious is this contention. The fact that there are more Cadillacs per capita in New York, or more mink coats per capita in New York, than in the Country as a whole does not establish that there is a conspiracy in New York against cheaper cars or cheaper furs. It is a consequence of the fact that the per capita wealth in the metropolitan New York area is greater than in the Country as a whole and that, therefore, there is a better market at a higher profit in that area for sales of

expensive merchandise than in the Country as a whole. By the same token, the cost of living in New York is greater than in the Country as a whole, an economic fact of life which is recognized by most employers and most businesses—except, we may say parenthetically, by Congress in fixing salaries.[8]

Furthermore, the fact that a picture did better or worse in the Country as a whole than it did in New York is not proof that it was discriminated against in New York or that it suffered lack of a competitive opportunity in New York. New York, with its multitude of theatres and the variety of films offered to people within easy reach of a number of theatres, may well have a theatre-going population which is more discriminating in its choice of pictures than other cities or towns where the variety of theatres and films is much less in proportion to the population; and thus a good picture may do better proportionately in New York than it does in the rest of the Country where there is not the same degree of choice available. Thus, the evidence was that the success of a picture in New York depends to a great extent upon whether it has had a first Broadway run and upon the reception accorded to the picture by the critics and that this is not comparably true in other parts of the Country.[9]

One test as to whether the reception of plaintiffs' films in the New York metropolitan area was due to a conspiracy of the defendants or whether it was due to the quality of the films is the reception the films had from an independent exhibitor in this area. The defendants offered the testimony of Russell Downing, the president and managing director of Radio City Music Hall, a large and representative motion picture theatre which was not in any way affiliated with, or connected with any producer or distributor. Mr. Downing testified:

> " * * * we try to avoid in the Music Hall—and I feel the Music Hall in a sense is no different from any other theatres in the area—we try to avoid playing pictures that people don't want. It is our job to find entertainment they want and we want pictures they will patronize."

His testimony established that out of the 195 Eagle Lion pictures, only 4 were submitted by Eagle Lion to Radio City Music Hall for screening and consideration, and that even these pictures were not accepted because, in the opinion of the witness, they did not measure up to the standards of the quality required by the Music Hall. No Eagle Lion pictures were shown there in this four year period although each of the eight major distributors had some of their pictures exhibited at that theatre during the period in question.

Although practically all of the films distributed by the plaintiffs were inferior

---

**8.** However, in the judicial system of the State of New York, this economic fact of life is recognized, for the State Supreme Court Judges in the metropolitan area receive a salary which is $5,000 a year higher than the Supreme Court Judges in other parts of the State.

**9.** Mr. Youngstein, who had been in charge of exploitation, advertising and publicity of the Eagle Lion films from 1946 until May of 1949, was asked the following question by the Court and gave the following answer:

"Q. Taking the Eagle Lion List of pictures generally while you were there, was it your impression that they would do better or worse proportionately in New York? A. Overall, in my opinion they would do worse in New York because they were not to any large extent critics' pictures. New York is one of the few places where critics' reactions help box office and help determine the entire selling of the picture from first run in the circuit, in the second, third and fourth run down the line until you have blanketed the City alone. That is the entire metropolitan territory. The newspapers have that importance.

"The very nature of this product at that time, with the exception of a picture like a Red Shoes or perhaps a Quartet, one or two others, if I took the time out to search through, but overal these were pictures that received terrible reviews in New York, pictures which I would say would do much better outside of New York than in New York."

in quality and drawing power to those distributed by the major distributors, the difference in net returns only became markedly apparent in those films which grossed nationally more than $500,000. This is evident when we see that 97 of the 195 pictures distributed by plaintiffs had national film rentals of less than $100,000. Included in those pictures were re-issue pictures of an antiquity which makes them almost part of the folklore of the cinema.[10]

■ But when we come to pictures which gross nationally more than $500,000, we find that this disparity in quality and drawing power still continued and, in the circumstances, it is not surprising that the ratio from the display of these pictures in the metropolitan New York area by the eight major distributors was greater than that of the plaintiffs. Plaintiffs' contention seems to be that they were entitled to derive from the New York metropolitan area film rentals bearing a ratio not less than the corresponding ratio for the eight major distributors. It must be kept in mind that the Sherman Act does not entitle any person to any particular part of a market. It does no more than guarantee a right to compete equally for so much of the market as it can capture and hold by legitimate business methods and the providing of merchandise which the customer will take. See Interborough News Co. v. Curtis Publishing Co., D.C.S.D.N.Y.1954, 127 F.Supp. 286, at page 297, affirmed 2 Cir., 1955, 225 F.2d 289.

Plaintiffs also urge that when defendants exhibited Eagle Lion Films, they did so only on discrimatory terms or after long delays. No evidence was introduced that any of the terms offered or agreed upon were the result of any conferences, agreements, or understandings between the defendants, or were the direct result of any illegal combination or conspiracy. At one point plaintiffs stated that they had no objection to their treatment on any individual film. But at other times, they referred to the terms which they received on individual films as indicative of what they considered the illegal combination or conspiracy. An analysis of the particular instances cited by the plaintiffs indicates a complete lack of proof that the terms which they received were the result of any illegal combination or conspiracy.

Plaintiffs urge, for example, that the contract terms for the film "T-Men" were discriminatory. Defendants countered with the argument that the contract for the showing of "T-Men" was not for that film alone but was for the showing of two Eagle Lion films on the same program—"T-Men" and "Out of the Blue"; and that from a business standpoint, the licensing arrangements were proper and appropriate. The Court cannot determine, in the abstract, what would have been a fair rental arrangement for these two films. Certainly, there is no proof that the contract arrangement was arrived at as a result of any agreement or understanding of the defendants or that the terms were the result of any combination or conspiracy of the defendants. For example, the plaintiffs offered no evidence of any selling efforts that they made to place these films elsewhere; they offered no evidence that they had attempted to secure an arrangement from RKO or any other circuit for these films.

Plaintiffs urged also that the films "Black Book" and "Trapped" were not shown by the defendants. However, the testimony shows that while one of the defendants was actually negotiating for these films, plaintiffs themselves sold the pictures for a first neighborhood run

---

10. Such as the following pictures which, in the four years involved in this action, had the following gross national revenue:

| | |
|---|---|
| "Getting Gertie's Garter" | $17,400 |
| "Up In Mable's Room" | 17,000 |
| "Twin Beds" | 15,600 |
| "Tillie's Romance" | 13,400 |

Included in the list were also such pictures as "Cattle Queen" which had a national gross revenue in this period of $2,800 and "Weaker Sex" which had a national gross revenue of $7,300.

on another circuit not controlled by either defendant.

 Here, again, the argument of the plaintiffs that they received discriminatory terms for the licensing of their films is not supported by any evidence sufficient to lead the Court to conclude that the terms agreed upon were the result of any illegal combination or conspiracy among the defendants. Whether the terms were the result of a poorer quality of the films or inferior selling efforts of the plaintiffs, or were the result of a preference of the defendants to take other films which were then available, is not established by the evidence. Plaintiffs, who had the burden of proof, certainly did not prove that any of these terms were the result of any illegal combination or conspiracy, nor did they establish that Eagle Lion films were denied an opportunity to be played upon the circuits of the defendants. In fact, as has been pointed out, all Eagle Lion films which had a national gross rental of $500,000 or more were actually shown upon the circuits of the defendants; and the Eagle Lion films which had a national rental of less than $500,000 derived a higher ratio of returns from the metropolitan New York area than they did from the national area when compared to similar low revenue films of the eight major distributors.

The Court finds as a fact that plaintiffs have failed to prove exclusion of their films by the defendants; that plaintiffs have failed to prove any conspiracy on the part of the defendants to exclude the plaintiffs from the opportunity of licensing their feature motion pictures on a competitive basis to the Loew's and RKO theatres which exhibit feature motion pictures in the New York metropolitan area on runs subsequent to first run Broadway; and that plaintiffs have failed to prove that any losses which they may have sustained were proximately caused by any combination or conspiracy on the part of the defendants to deprive the plaintiffs of such opportunity to license their pictures on a competitive basis.

The Court concludes that this lack of proof is not cured by the mere decree in the Paramount case and that the complaint should, therefore, be dismissed. Monticello Tobacco Co. v. American Tobacco Co., 2 Cir., 1952, 197 F.2d 629, certiorari denied 1952, 344 U.S. 875, 73 S.Ct. 168, 97 L.Ed. 678.

I therefore direct entry of judgment for the defendants dismissing the complaint, with costs.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

Should either party desire enumerated or additional findings, they may be proposed upon notice to the other side at any time within ten days after the date of this order.