**EAGLE LION STUDIOS, Inc., Eagle Lion Films, Inc., PRC Productions, Inc., Chesapeake Industries, Inc., Appellants,**

v.

**LOEW'S, Inc., RKO Theatres, Inc., and RKO Film Booking Corp., Appellees.**

No. 96, Docket 24224.

United States Court of Appeals
Second Circuit.

Argued Nov. 15, 1956.

Decided Sept. 9, 1957.

Clark, Chief Judge, dissented.

James L. O'Connor, New York City (William L. McGovern, Robert L. Wright, Seymour Krieger, Arnold, Fortas & Porter, Washington, D. C., of counsel), for appellants.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City (S. Hazard Gillespie, Jr., Francis W. Phillips, Robert B. Fiske, Jr., New York City, of counsel), for appellee Loew's, Inc.

O'Brien, Driscoll & Raftery, New York City (Edward C. Raftery, George A. Raftery, William F. Whitman, New York City, of counsel), for appellees RKO Theatres, Inc., and RKO Film Booking Corp.

Before CLARK, Chief Judge, and HINCKS and WATERMAN,[1] Circuit Judges.

WATERMAN, Circuit Judge.

The appellants, four affiliated corporations formerly engaged in the production and distribution of motion pictures, appeal from a judgment dismissing their complaint after a trial before the Court without a jury. D.C.S.D.N.Y.1956, 141 F.Supp. 658. The appellants had brought suit against Loew's, Inc., RKO Theatres, Inc., and RKO Film Booking Corp., the appellees, to recover treble damages under the anti-trust laws, 15 U.S.C.A. §§ 1, 2, 15. These defendants, during the period in issue, were engaged in the exhibition of motion pictures. The complaint, insofar as it concerned the appellees, set forth a claim for damages for losses allegedly resulting from a conspiracy to exclude the plaintiffs during the period 1946–1950 from licensing their films on a competitive basis to the "first subsequent run" theatres of Loew's and RKO in the metropolitan area of New York City.[2]

Since the facts pertinent to this litigation were set forth in detail by Judge Dawson in his comprehensive opinion below, see 141 F.Supp. 658, we will mention only those facts necessary to the disposition of this appeal.

The plaintiffs and their predecessor organizations produced and distributed motion pictures from 1943 to 1951. During this period they also distributed the films of certain other domestic and foreign producers made either in this country or abroad. The defendants, at the times material to this action, operated motion picture theatres in metropolitan New York, which were known, respectively, as the Loew's and RKO circuits. During the years 1946 to 1950, the years involved in this suit, the Loew's circuit in the metropolitan area comprised approximately 60 "subsequent run" theatres, and the RKO circuit between 30 and 40 such theatres. The term "subsequent run" applies to all theatres in the New York area except the 40 or more "first run" theatres concentrated

---

1. This appeal was argued before a panel composed of Chief Judge Clark and Judges Frank and Hincks. Judge Frank died before any opinion had been prepared. Thereafter Judge Waterman was substituted.

2. The metropolitan area was defined in the complaint as "the five boroughs of greater New York City, southern portion of Westchester County and western portion of Nassau County, New York State." No part of the State of New Jersey was included.

in the Broadway midtown area of New York City. During this period in suit there were at least 600 subsequent run theatres in metropolitan New York, as that area was defined by the pleadings. However, these theatres fell into an elaborate hierarchy of "*first* subsequent run," "*second* subsequent run," and so forth. Approximately 45 of the Loew's theatres were in the "first subsequent run" category, whereas from 31 to 36 of the RKO theatres (depending on the year in question) were so designated.

Although no findings were made below as to the total number of "first subsequent run" theatres in the New York metropolitan area, it is apparently undisputed that the defendants occupied a dominant position in the "first subsequent run" exhibition market. The evidence at trial also tended to show that this market was the crucial one in the entire New York metropolitan subsequent run exhibition field, because the rental rates, billings, and playing positions of individual films throughout their subsequent run history were substantially influenced, if not determined, by the treatment they received from the "first subsequent run" theatres.

Each of the two defendant circuits exhibited about 208 pictures a year—or approximately 4 a week. Generally the same program, comprised of a double feature, would be played simultaneously throughout the first subsequent run theatres of an entire circuit. The playing engagements were typically for the "long half" of the week (Thursday through Sunday) or for the "short half" of the week (Monday through Wednesday). An individual film could receive "top" or "equal" billing, or could be played as the "second" feature, during either the long or short half of the week.

From 1946 to 1950, the plaintiffs distributed 195 films, which earned total gross film rentals of $39,107,800 in this country, of which $2,362,200 was received from subsequent run theatres in the New York metropolitan area. The trial court found, 141 F.Supp. at page 663, that "of the 195 pictures distributed

by the plaintiffs during the period in question, the defendants exhibited 85 pictures on one or the other of its circuits in the New York metropolitan area * * * Each of the defendants exhibited certain other pictures distributed by the plaintiffs in one or more theatres amounting to less than the full circuit. Loew's played some 39 additional pictures in addition to the 50 which it played on the entire circuit. RKO exhibited in one or more of its theatres during the period in question some 55 additional pictures."

Thus the plaintiffs did not attempt to prove below, nor do they contend on appeal, that the defendants conspired to totally exclude their pictures from exhibition in the defendants' theatres. Rather, the issues in controversy were framed in a pre-trial order as follows:

"1. Did the defendants combine and conspire in violation of the anti-trust laws of the United States to exclude the plaintiffs from the opportunity of licensing *on a competitive basis* their feature motion pictures to Loew and RKO theatres which exhibit feature motion pictures in the New York metropolitan area on runs subsequent to first run Broadway? (Emphasis added.)

"2. If so, were the plaintiffs directly damaged in their business or property as the result of the said illegal combination and conspiracy, and, if so, in what amount?"

The trial court answered both questions in the negative, and, dismissing the complaint, entered judgment for the defendants. On appeal, we affirm that judgment, since we discern no error of law in the proceedings below, and we do not believe that the trial court's findings of fact were "clearly erroneous." Fed. R.Civ.P. 52(a), 28 U.S.C.A.

At trial, in order to sustain their burden of proof on both issues, the plaintiffs relied primarily upon (1) the findings of fact and conclusions of law contained in the final decree of the Paramount case, United States v. Loew's Inc., Equity No.

87–273, S.D.N.Y., filed Feb. 8, 1950, affirmed 1950, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380 (for prior history, see United States v. Paramount Pictures, Inc., D.C., 66 F.Supp. 323, Id., D.C.1946, 70 F.Supp. 53, reversed and remanded in part, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; D.C.1949, 85 F.Supp. 881); (2) detailed statistics comparing film rentals earned by the plaintiffs during the period in question with those earned by the eight major distributors in the Paramount case; (3) the testimony of the president of one of the plaintiffs; (4) a letter written by the president of another of the plaintiffs to the president of Loew's.

On appeal, the plaintiffs urged two principal grounds for reversal: (1) that the trial court erred in its construction of the Paramount judgment; and (2) that the trial court did not properly evaluate the comparative film rental statistics.[3] We find both of these contentions without merit.

1. *The Paramount Judgment*

■ "A government [anti-trust] suit, while primarily in the public interest, if successful, also accrues to the immediate benefit of those injured by the wrongful conduct." T. C. Theatre Corp. v. Warner Bros. Pictures, Inc., D.C.S.D.N.Y.1953, 113 F.Supp. 265, 269. Under section 5 of the Clayton Act, 15 U.S.C.A. § 16, "A final judgment or decree heretofore or hereafter rendered in any civil or criminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under

said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties * * *" Relying on section 5, the appellants have strenuously contended throughout this litigation that the judgment in the Paramount case constitutes *prima facie* evidence of a conspiracy by the appellees to deny the plaintiffs competitive access to the appellees' theatres in metropolitan New York.

The Paramount judgment embodied findings of fact and conclusions of law based on the situation in the motion picture industry as it existed in 1945. The plaintiffs argue, however, that the conditions found to exist at that time continued until 1950, the date of the final order in the Paramount case.

As the trial court pointed out, "the primary issue in that [the Paramount] case related to the effect under the antitrust laws of a combination between the large producers of motion pictures who also controlled, to a substantial extent, the places of exhibition of those motion pictures." The great bulk of the many findings of fact and conclusions of law contained in the final Paramount decree do not touch upon the narrow issue here at bar. See United States v. Loew's Inc. et al., Equity No. 87–273, S.D.N.Y., filed Feb. 8, 1950, affirmed 1950, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380. The appellants direct our attention, however, to several findings and conclusions, particularly Finding No. 154(d) and Conclusion No. 16, which they contend are evidence of the alleged conspiracy set forth in their complaint. Especial emphasis is placed on the following sentence of Finding No. 154(d):[4]

3. The plaintiffs on appeal do not appear to rely to any real extent on the testimony and correspondence of their officers that was introduced at trial. Nevertheless, we shall advert briefly to that evidence later in the opinion.

4. Finding No. 154(d), in its entirety, reads as follows:

"154(d). In New York City Loew and RKO divided the neighborhood prior run

products of the various defendant distributors under a continuing arrangement so that there was no competition between them in obtaining pictures. On one occasion where Paramount was having a long dispute with Loew's as to rental terms for Paramount films to be shown in Loew's New York neighborhood circuit of theatres, no attempt was made by Paramount to lease its films to RKO for

In New York City Loew and RKO divided the neighborhood prior run product of the various defendant distributors under a continuing arrangement so that there was no competition between them in obtaining pictures.

Conclusion of Law No. 16 in the Paramount case reads as follows:

Loew's, Incorporated, has violated the Sherman Act by conspiring with RKO to monopolize and monopolizing the first neighborhood run in New York City, and by the dividing of that market between itself and RKO.

After examining Finding No. 154(d) and Conclusion No. 16, as well as the other portions of the Paramount record that were relied upon by plaintiffs,[5] the trial court, see 141 F.Supp. at page 667, concluded that "while the findings may perhaps constitute evidence * * * that Loew's and RKO had no competition between themselves in obtaining pictures from the defendant distributors who were parties to the Paramount case and had monopolized between themselves the first neighborhood run in New York City, the findings, standing by themselves, are certainly not evidence that there was no competition between Loew's and RKO in obtaining and distributing pictures of so-called 'independents' such as the plaintiffs in the present case."

The appellants would have us believe that this was a niggardly construction of the Paramount judgment and that the only fair import of that judgment, as applied to the issue at bar, was that the plaintiffs were denied the opportunity to compete on an equal basis with the eight major distributors in the sale and licensing of their films to the defendants. Their argument appears to be: The defendants not only agreed not to compete with each other for the films of the eight major distributors, but each defendant also agreed to give preferential treatment to the films of those distributors that were allocated to it, provided that the films of those distributors met the particular defendant's minimal exhibition standards and were obtainable by it on satisfactory terms. That is, according to the appellants, the finding in Paramount of a concerted assignment by the defendants here of certain distributors necessarily implied a finding that there was an affirmative duty on the part of each defendant to use, whenever possible, the product of the distributors assigned to it, in addition to the negative duty not to compete for the product of those distributors that were assigned to the other defendant. The impact of such a conspiracy upon the plaintiffs would be to deny them truly competitive access to the defendants' theatres, inasmuch as their product would be purchased by each defendant only to fill marginal needs that were not satisfactorily met by the Paramount distributors assigned to it.

■■■ The appellants contend that the construction they argue for is the only reasonable inference to be drawn

---

exhibition in the latter's circuit, nor was any effort made by RKO to procure Paramount films as they both evidently preferred to adhere to the existing arrangement, under which Loew's circuit consistently exhibited the films of itself, Paramount, United Artists, Columbia and half of Universal, while RKO exhibited the films of itself, Fox, Warner, and half of Universal. Accordingly, the showing that 85% of Loew's theatres are in competition with theatres of other defendants is misleading and may properly be reduced by the exclusion of its New York neighborhood theatres. If this is done, it would give Loew a percentage of approximately 42% of its theatres in com-

petition with other defendants in cities over 100,000."

5. In addition to Finding No. 154(d) and Conclusion No. 16, the appellants call our attention to Findings No. 84, 99, 100, 127, 147(c), 156(b), and 158, and Conclusions No. 7 and 12 of the final decree in the Paramount case, Equity No. 87–273, S.D.N.Y., filed Feb. 8, 1950, affirmed 1950, 339 U.S. 974, 70 S.Ct. 1032. We have examined these findings and conclusions, as well as the many other findings and conclusions embodied in that decree. We conclude that their relevance to the issues here in suit is even less than that of Finding No. 154(d) and Conclusion No. 16, which are discussed in detail in our opinion infra.

from the Paramount finding and conclusion quoted above. In so doing, however, they misconceive the import and applicability of section 5. In determining, under that section, the effect of a judgment in a prior anti-trust suit it is not our function to consider inferences, whether reasonable ones or not, that might be drawn from the language of the prior judgment. Under section 5 a judgment in a prior suit is *prima facie* evidence "as to all matters respecting which said judgment * * * would be an *estoppel as between the parties thereto * * *"* (Emphasis added.) Thus, in construing a prior judgment for purposes of this statute, the court in the subsequent action does not sit as a trier of fact, *i. e.*, it does not have wide license to draw inferences from the judgment and record in the prior litigation. Rather, the court is circumscribed by the relatively narrow limits of the doctrine of estoppel:

> "The evidentiary use which may be made under § 5 of the prior conviction of respondents is * * * to be determined by reference to the general doctrine of estoppel * * * Such estoppel extends only to questions 'distinctly put in issue and directly determined' in the criminal prosecution." Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 568–569, 71 S.Ct. 408, 414, 95 L.Ed. 534.

See also Partmar Corp. v. Paramount Pictures Theatres Corp., 1954, 347 U.S. 89, 102, 74 S.Ct. 414, 98 L.Ed. 532; Theatre Enterprises, Inc., v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 542, 74 S.Ct. 257, 98 L.Ed. 273; Paramount Film Distributing Corp. v. Village Theatre, 10 Cir., 1955, 228 F.2d 721, 727; Loew's, Inc. v. Cinema Amusements, Inc., 10 Cir.1954, 210 F.2d 86, 90, certiorari denied, 347 U.S. 976, 74 S.Ct. 787, 98 L.Ed. 1115; Monticello Tobacco Co. v. American Tobacco Co., 2 Cir., 1952, 197 F.2d 629, 631–632, certiorari denied, 344 U.S. 875, 73 S.Ct. 168, 97 L. Ed. 678; T. C. Theatre Corp. v. Warner Bros. Pictures, D.C.S.D.N.Y.1953, 113 F. Supp. 265, 269–270.

Subsequent to the Emich decision, this court stated in Monticello Tobacco Co. v. American Tobacco Co., 2 Cir., 1952, 197 F.2d 629, 631–632 (per Judge Clark):

> "* * * whatever is crucial to the treble-damage case and is not *distinctly determined* in the previous government suit must be proven by direct evidence. Dipson Theatres v. Buffalo Theatres, 2 Cir., 190 F.2d 951, 958, certiorari denied 342 U.S. 926, 72 S.Ct. 363 [96 L.Ed. 691]. Section 5 does not permit a haphazard use of a criminal judgment merely for its aura of guilt, or 'to imply new wrongdoing from past wrongdoing.' Hastie, C. J., dissenting in Milgram v. Loew's, Inc., 3 Cir., 192 F.2d 579, 595. See also Note, 65 Harv.L.Rev. 1400, 1404–1407." (Emphasis added.)

Hence, in determining the import of the Paramount judgment, we must be guided by the well-established principles of collateral estoppel. It is true that where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action. But "a judgment on one cause of action is not conclusive in a subsequent action on a different cause of action as to questions of fact *not actually litigated and determined in the first action.*" Restatement, Judgments § 68 (1942). (Emphasis added.)

Applying these principles to the Paramount judgment we conclude that the issue here in suit was not "distinctly determined" in the Paramount litigation. In that case the court found that these defendants had agreed not to compete with each other for the films of the eight major distributors. The aim, and apparent effect, of that conspiracy was the monopolization by the defendants of the first subsequent run exhibition market in

metropolitan New York, to the detriment of other theatre *exhibitors* in that area. Thus the court in Paramount did not address itself to the different issue now before us, *i. e.*, whether these defendants conspired together to exclude these plaintiffs, who were independent *distributors,* from the opportunity of licensing their pictures on a competitive basis to the defendants' theatres in metropolitan New York.

■ Nor was there any finding in the Paramount case to the effect that the defendants had agreed with each other to impose upon themselves an affirmative duty to give preference to the motion pictures of those major distributors that were assigned to them, thereby foreclosing the plaintiffs from access to all but the marginal exhibition needs of the defendants. In short, we must look elsewhere if we are to find any evidence of the conspiracy that the plaintiffs here charge.

2. *Comparative Film Rental Statistics*

At the trial the plaintiffs relied on certain statistical data both as evidence of the conspiracy charged in their complaint and as evidence of the amount of damages allegedly suffered by them as a result of that conspiracy. On appeal, they advance these statistics for the primary purpose of showing injury; secondarily, as proof of the existence of the conspiracy. We shall first consider them in the latter context, however, since it is necessary to find a conspiracy by the defendants adversely affecting these plaintiffs before we reach the question of damages. And, of course, if no conspiracy is found, all evidence admitted on the question of damage becomes of no moment.

At trial the plaintiffs introduced, as their Exhibit 10, a chart entitled "Ratio of Subsequent Run Rental from Metropolitan New York to National Film Rental Less Such Subsequent Run Rental."

This chart indicated that the plaintiffs had received 6.4% of their film rentals on the 195 pictures distributed by them during the years 1946 to 1950 from subsequent run theatres in the metropolitan area of New York. The chart also showed that, on the basis of 96 "representative" pictures, the eight major distributors earned 8.9% of their film rentals from New York subsequent run theatres during the period of the alleged conspiracy.

The 96 "representative" pictures of the eight major distributors were selected by the following method: All films of each distributor for each of the years from September 1, 1946, to August 31, 1950, were put in 32 separate lists in the order of the total gross national revenue each earned. Three median rentals were then selected from each list: (1) the median rental for the entire list; (2) the median rental from the top quarter of the pictures; and (3) the median rental from the lowest quarter of the pictures.

These statistics were introduced in support of the following evidentiary hypothesis advanced by the plaintiffs: If the plaintiffs did not receive as large a proportion of their national film rentals from the New York subsequent run theatres as did the major distributors, the difference was attributable to discrimination against the plaintiffs' pictures resulting from the concerted action of the defendants, who were the dominant exhibitors in the New York first subsequent run market.[6]

Using the difference betwen 6.4% and 8.9% (2.5%), the plaintiffs calculated that by reason of the defendants' concerted discrimination, they lost at least $417,000 in net rentals on the films distributed by them during the four years in suit. The figure of $417,000 was arrived at by first taking 2.5% of the difference between the plaintiffs' total domestic gross film rentals and their New

---

6. It would seem that, in order for this hypothesis to have any color of validity, it must be assumed that the plaintiffs were not discriminated against elsewhere, or at least not to the extent that they were discriminated against in metropolitan New York.

York neighborhood gross film rentals. The resulting sum, $919,000, was then reduced by subtracting 54.6% therefrom, an amount representing the average share of the gross rental that was passed on to the producer.[7]

The trial court made the following breakdown of the plaintiffs' statistics:

*Eagle Lion*

| No. of Pictures | Pictures with National Film Rental | Ratio of Metropolitan Sub-run Rent to National Less Metropolitan Sub-run Rent |
|---|---|---|
| 97 | Under $100,000 | 6.9% |
| 51 | 100,000 to 200,000 | 5.4% |
| 10 | 200,000 to 300,000 | 6.7% |
| 16 | 300,000 to 400,000 | 5.9% |
| 3 | 400,000 to 500,000 | 8.6% |
| 18 | Over 500,000 | 6.7% |
| 195 | | 6.4% |

*8 Distributors*

| No. of Pictures | Pictures with National Film Rental | Ratio of Metropolitan Sub-run Rent to National Less Metropolitan Sub-run Rent |
|---|---|---|
| 7 | Under $100,000 | 5.2% |
| 10 | 100,000 to 200,000 | 4.9% |
| 7 | 200,000 to 300,000 | 6.6% |
| 6 | 300,000 to 400,000 | 5.1% |
| 5 | 400,000 to 500,000 | 7.1% |
| 61 | Over 500,000 | 9.2% |
| 96 | | 8.9% |

As is clearly revealed by this analysis, only the 18 pictures distributed by the plaintiffs that earned national rentals in excess of $500,000 drew proportionally less revenue from the New York subsequent run market than did comparable box office attractions distributed by the eight major distributors. Indeed, on films earning less than $500,000 nationally, the plaintiffs received a slightly higher proportion of national rental from the metropolitan subsequent run market than did the eight majors. On appeal, the plaintiffs attempt to explain this latter phenomenon by pointing out that many of their lower-earning pictures were foreign made, and thus were films that traditionally earn a higher percentage of their total national rentals in the New York area than domestic productions. Be that as it may, nothing contained in the statistics applicable to the great bulk of plaintiffs' pictures (177 out of 195 earned less than $500,000 nationally) supports an inference that the defendants agreed with each other to discriminate in any way against the exhibition of the plaintiffs' films.

Nor did the court below find any evidence of concerted discrimination with respect to those 18 pictures distributed by the plaintiffs that earned over $500,000 nationally. "All 18 of these films each had a first neighborhood run in the entire Loew's or the entire RKO circuit in metropolitan New York. Seventeen of

7. Apparently no allowance was made for any other expenses incident to the earning of film rentals.

the pictures played the long half of the week, and six had top billing." 141 F. Supp. at page 670. The accuracy of these findings has not been attacked on appeal. Any further meaningful comparison between the New York rentals of these films and those of the major distributors in the $500,000-plus bracket is complicated by the fact that 61 out of the 96 "representative" pictures of the majors are in this high-earning category, whereas only 18 out of the 195 films distributed by the plaintiffs were comparably successful in their national performances.

■ The plaintiffs maintain, however, that even though many of their films were exhibited in the defendants' theatres they were shown on discriminatory terms, i. e., pictures distributed by the plaintiffs allegedy were forced to endure longer "clearances" between first and subsequent runs, and were obliged to accept less favorable rental terms than comparable box office attractions distributed by the eight majors. We can find nothing in the record to support the claim that the treatment accorded any specific film distributed by the plaintiffs was dictated by any consideration other than the independent business judgment of the defendants' officers. The trial judge was unimpressed by the plaintiffs' attempts to show concerted discriminatory treatment of certain individual pictures distributed by the plaintiffs. See 141 F.Supp. at 672–73. We accept his conclusion that no proof of a conspiracy to discriminate against any of these films was established by the testimony and statistics adduced by the plaintiffs.

In support of the claim that their pictures, when considered collectively, were forced to endure unwarrantedly long clearances between first and subsequent runs, and low flat rentals rather than a percentage of the box office receipts, the plaintiffs introduced the following compilation of statistics:

| | Average Circuit Rental | Average New York Metropolitan Rental Less First-Run Broadway |
|---|---|---|
| **Long Half—Top or Equal Billing** | | |
| Eight Majors | $97,500 | $190,000 |
| Eagle Lion | 55,200 | 101,000 |
| **Long Half Second** | | |
| Eight Majors | 15,300 | 40,000 |
| Eagle Lion | 15,200 | 30,000 |
| **Short Half** | | |
| Eight Majors | 7,500 | 16,000 |
| Eagle Lion | 2,700 | 7,500 |

The plaintiffs point out that the average circuit rental ($55,200) for their pictures that played "Long Half—Top or Equal Billing" in the defendants' circuits was substantially less than the average circuit rental ($97,500) for films distributed by the eight majors that were accorded comparable playing positions. The plaintiffs also call our attention to the disparity between the average circuit rental ($7,500) for pictures of the majors that were exhibited during the "short half" of the week in the defendants' circuits and the average rental ($2,700) for films distributed by the plaintiffs and shown during the "short half." No significant difference for films playing the "Long—Second" was re-

vealed by this chart. ($15,300 for the majors as against $15,200 for the plaintiffs.)

The defendants, on the other hand, emphasize the second column in this chart— the figures respresenting the "Average New York Metropolitan Rental Less First-Run Broadway." These figures take into account revenue from *all* subsequent run theatres in the New York area, not just those owned or operated by the defendants. Using the figures in both the first and second columns to compute comparative ratios, we find that on pictures shown during the long half of the week, top or equal billing, the plaintiffs received 54.6% of their New York subsequent run film rental from the defendants' theatres, whereas the eight majors received only 51.3% of their metropolitan subsequent run rental on pictures playing those positions from the Loew's and RKO circuits. A similar computation reveals that on pictures given second billing on the long half of the week, the plaintiffs received 50.6% of their New York subsequent run film rental from the defendants, whereas the eight majors derived only 38.3% from this source. Thus on pictures falling into these two categories, the plaintiffs fared proportionally better in the defendants' circuits, as compared with other New York neighborhood theatres, than did the eight majors—a fact clearly tending to rebut the plaintiffs' claims of discrimination against their pictures by the defendants.

It is only on pictures playing the short half of the week that the plaintiffs received a smaller proportion (36%) of their total New York subsequent run rental from the defendants than did the eight major distributors (47%). However, as we noted above, the plaintiffs received a higher proportion of their total domestic film rental from the New York subsequent run theatres on pictures nationally grossing less than $500,000 than did the majors on comparable box office attractions. In general, pictures playing the "short half" fell into this low revenue category.

■ Thus, once again, the plaintiffs' statistics are susceptible of conflicting interpretations, helpful alike to the defendants' position as well as the plaintiffs'. We therefore find that the comparative film rental statistics, in and of themselves are not reliable proof of the existence of the alleged conspiracy.

3. *Other Evidence*

■ The only testimony of an officer of the plaintiffs was that of Mr. MacMillan, the president of Chesapeake Industries, the parent corporation. He testified that sometime in 1950, after the decree had been entered in the Paramount case, he went to the offices of the defendants and complained about discrimination against the plaintiffs' films, saying to the president of RKO "that unless we got competitive access to the circuit we would have no alternative but to bring a suit for damages under the antitrust laws." [8] The trial judge properly gave little weight to this self-serving declaration, particularly since MacMillan admitted that he "personally had nothing to do with the sale or distribution of pictures to the exhibitors." The other witnesses called by the plaintiffs contributed no independent competent testimony tending to establish the existence of the alleged conspiracy.

The presidents of both defendant corporations took the stand and stoutly denied that there was any agreement between the defendants relating to the licensing of the plaintiffs' pictures. They each also disclaimed knowledge of licensing negotiations that the other defendant had with the plaintiffs. Additionally the

---

8. The plaintiffs introduced a letter written in August 1948 by Arthur Krim, the President of Eagle Lion Studios, to Joseph Vogel, the President of Loew's, and the latter's reply. Krim complained that Loew's was unjustifiably discriminating against the plaintiffs' pictures.

Vogel answered to the effect that Loew's had shown "ninety per cent" of the pictures offered to it by the plaintiffs, and that the terms on which those pictures were licensed were influenced solely by business considerations.

defendants called as a witness one Max Youngstein, who had been in charge of "advertising, publicity and exploitation" for plaintiff Eagle Lion Films from 1946 to 1948. He testified that he was not aware of any conspiracy by the defendants to discriminate against the plaintiffs' pictures. In his opinion, the poor returns on the plaintiffs' films were attributable to their quality, since, from the basis of box office appeal, they were at "the very bottom rung of the ladder" and "much inferior" to films contemporaneously offered by other distributors.

Also introduced by the defendants was the testimony of Russell Downing, the president and managing director of Radio City Music Hall, a large first run New York theatre that was not affiliated or connected with any producer or distributor. Downing testified that out of the 195 pictures distributed by the plaintiffs, only four were submitted to his theatre for "screening" and consideration, and that not one of these four was accepted because, in the opinion of the witness, they did not meet the standards of quality—at least as measured by potential box office drawing power—required by the Music Hall.

Perhaps significantly, the plaintiffs did not put on the stand any individuals who had been engaged in negotiating for the distribution of their pictures during the period of the alleged conspiracy, and who would have had first hand knowledge of conspiratorial discrimination, if any, experienced by the plaintiffs.

Thus an examination of the entire trial record, as well as an analysis of the Paramount judgment, supports the findings of the trial judge and his ultimate conclusion that the plaintiffs failed to prove the existence of the alleged conspiracy. Since the conspiracy was not proven, we do not examine the questions plaintiffs raise relating to the elements of alleged damages they claim to have suffered, and with respect to which much of their expert testimony was directed.[9]

Judgment affirmed.

CLARK, Chief Judge (dissenting).

The trial judge in my view gave the Paramount judgment not only "a niggardly construction," but one quite opposite to its intended meaning as to the issues here involved. By so doing he deprived the plaintiffs of its effect as "prima facie evidence" against these defendants as provided in the statute, 15 U.S.C. § 16. For the judgment found specifically that in New York City these defendants divided the neighborhood prior run product of the distributor defendants under a continuing arrangement, "so that there was no competition between them in obtaining pictures." Paramount Finding No. 154(d). It also held that they conspired to and did monopolize the first neighborhood run in New York City and *divided* that market between them. Paramount Conclusion No. 16. The judge here construed all this as not including the independent distributors and as saying only that Loew's and RKO merely divided the market for their coconspirators' films. He read the major holding of "no competition between them in obtaining pictures" as though it had added at the end, "of the major distributors." This curiously narrow and unrealistic reading is belied by the words precisely used, by the findings and conclusions in other parts of the judgment, and by the background against which the words must be read.

With deference I submit that the quoted provisions are clearly intended to express the broader deduction that there was no real competition between these defendants in obtaining any pictures, whether distributed by independents or by the major distributors. Unless this were so, they would not be actually dividing the New York City market between them. This reading moreover accords with other Paramount findings and conclusions which expressly include independent exhibitors and distributors.

9. Among these elements was a claim that the plaintiffs were forced to liquidate under unfavorable conditions with a result-ing "out-of-pocket liquidating loss" of $146,400.

Thus Paramount Finding No. 84 states that both independent exhibitors and independent distributors had to conform to the fixed scale of clearance, runs, and admission prices set by defendants if they wished to get satisfactory runs for their pictures or to compete in exhibition with defendants' theatres or those to which they had licensed their pictures. And Finding No. 147(c) is an express determination of "lessened competition among defendants and between them and independents." Similar holdings appear elsewhere in the judgment, as in Finding 156(b) and Conclusions 7 and 12.

Moreover, this reading alone is consistent with the general broad findings of the Paramount decision that these defendants and the major film companies effectuated a conspiracy on a national scale to restrain trade by monopolizing the distribution of motion pictures through various unfair practices, such as block booking, imposition of fixed runs and fixed admission prices on independent distributors, exclusion of independents as desired, use of vertical integration to further their business of exhibiting pictures, and so on. To hold that this gigantic and complete monopoly does not reach the independent distributors, but leaves them free to compete with the big companies, does not make sense. And, as we have seen, it is disproved by the findings and conclusions actually stated and the relief finally granted.

Here the defendants have adroitly supplied a backdrop for the narrowing construction they support by urging that "the Paramount case was for exhibitors, not distributors." And this case has been somewhat heralded as a novel treble-damage claim, since it is brought not by independent movie theatres damaged by discrimination in procuring pictures to exhibit, but by the film producers and distributors themselves. It is of course true that the private cases previously before us have been brought by exhibitors, and this may indeed be the first case of other independents. But this atmosphere of novelty is not enough to justify denial of relief to plaintiffs. No such limitation is stated in the Paramount judgment itself; and various deductions which the parties draw from attempts at expansion or contraction of its form, as rejected by the then sitting judges, seem to me but the more to support the adequacy of what they did and thought they were doing. The statute, 15 U.S.C. § 16, supra, gives the benefit of the prima facie evidence rule in any action "by any other party" under the antitrust laws. And that would seem to be conclusive to reach and benefit these plaintiffs. Obviously the findings concerning independent exhibitors and distributors were quite within the direct issues in the case, and the extensive discussion here of the "doctrine of estoppel" appears to be only another way of saying that the findings did not mean what plaintiffs claim and I believe to be their fair and common-sense interpretation.

The Paramount findings pertain to the year 1945. But the plaintiffs showed by quite adequate evidence that the same conditions continued in the period 1946 through 1950. And as the plaintiffs point out, the judges in the Paramount case at a later stage heard evidence as to conditions in 1948 without finding the need of making changes. The findings quoted were actually dated February 8, 1950. Moreover, plaintiffs point out that Eagle Lion Studios succeeded in 1946 to the business of PRC Pictures, Inc., one of the three nationwide independent film distributors found in the Paramount case to be adversely affected by the defendants' conspiracy.

I conclude that the plaintiffs thus presented a prima facie case which it became the duty of the defendants to rebut. The error of the court in denying this position to the plaintiffs was actually somewhat compounded by its ruling denigrating the Paramount judgment to the force only of some "evidence" in the case—an inconsistent approach not at all justified under the statute, and one which could only confuse. For if that judgment was no more inclusive in its terms than the judge ruled, then it was not evidence here at all.

Thus dismissal below was unwarranted. Possibly we could proceed to final judgment on the basis that the prima facie case had not been rebutted. The preferable course, however, would appear to be a remand for re-examination by the trial court of the evidence in the light of the statutory command. This seems to me particularly desirable because the trial judge found this evidence of damage inadequate to justify a plaintiffs' judgment. Actually considerable evidence involving statistical comparisons was introduced; although some of the deductions doubtless contained fallacies of the kind the judge criticized, yet a more sympathetic approach might have contributed some constructive suggestions and deductions for the assaying of this evidence. Thus a comparison of the reactions of New York City and national audiences or of Eagle Lion's successful films with other selected films of the major distributors seems perfectly possible to yield something more nearly factual than general conclusions based on what is supposed to be the degree of cultural sophistication of New Yorkers over others. In the present posture of the case I deem it hardly worth while to document these suggestions in detail, but I must call attention—for fear that it has been overlooked—to the well established principle casting upon the wrongdoers the risk of uncertainty as to the damages that flow from a wrong. William H. Rankin Co. v. Associated Bill Posters of United States and Canada, 2 Cir., 42 F.2d 152, certiorari denied Associated Bill Posters of United States and Canada v. Wm. H. Rankin Co., 282 U.S. 864, 51 S.Ct. 37, 75 L.Ed. 765; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561–564, 51 S.Ct. 248, 75 L.Ed. 544; Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652; Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 979. Of course plaintiffs' films do not all stand on the same level. Some were successful and some were not. Some quite probably deserved the low artistic and box-office-appeal rating given them by defendants. But there appeared to have been some fairly conspicuous exceptions. It does not seem an impossible task for the trier to discriminate fairly between these elements of damage and to achieve a just over-all result.

There seems to be a developing trend in some of our trial courts of hostility toward the "big" antitrust case and of discovering obstacles—going even back to matters of pleading and pre-trial—in the way of a free showing of the need of remedial relief. Humanly speaking we can well sympathize, for these trials are a burden, if not a bore, to a busy, over-worked court. But we are dealing with settled and cherished Congressional policy which is not for us to change or hamper. I suggest that these judicially formed limitations are a definite infringement of legislative policy. However serious the load, I do not believe our able trial judges desire to take any permanent course thus opposed to legislative purposes. But here, while doubtless not contemplated, the course of trial has had that consequence. I think, therefore, it requires and deserves a new start at the trial level.

I feel the greater confidence in the views I have expressed because Judge FRANK, who originally heard the appeal, voted to reverse, and set forth similar conclusions in a tentative memorandum he had prepared before he died.